No. 32,997

THE STATE OF KANSAS, *Appellee*, v. THOMAS (TOMMY) HILL, *Appellant*.

(64 P. 2d 71)

Opinion filed January 23, 1937.

*Frederick G. Apt, A. R. Enfield,* both of Iola, and *Dallas W. Knapp,* of Coffeyville, for the appellant.

*Clarence V. Beck,* attorney general, *Wint Smith,* assistant attorney general, *Richard L. Becker,* county attorney, *Raymond Belt,* deputy. county attorney, and *Otho W. Lomax,* of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The defendant was convicted of robbery in the first degree, and appeals.

The state's evidence and other facts in the record tended to show the following: South Coffeyville is situated in Oklahoma, just across the state line from Coffeyville, Kan. The defendant was born in Mound Valley, a few miles northeast of Coffeyville. In 1907 he moved to Coffeyville, and about 1912 he moved to South Coffeyville. He registered in Nowata county (apparently the situs of South Coffeyville) in 1917, and never changed his registration, although in the World War he enlisted in the army as a resident of Coffeyville, Kan., and drew compensation as a Kansas soldier. Eventually he married and he and his wife took up their abode in South Coffeyville, but he usually bought his domestic supplies in Coffeyville; and he was in and out of that city almost every day, for years, except when periods of enforced absence prevented. For one or more indefinite intervals since his marriage he and his wife have resided on the Kansas side of the state line.

During the period of present concern defendant operated some sort of resort named the "Casa Del" in South Coffeyville. He also had something to do with an aviation hangar and airport in the vicinity of South Coffeyville, and he did some collecting of monthly bills for a public utility company. The record also tells of some other activities which engrossed part of defendant's time and attention on the south side of the state line.

The facility with which criminals may pass from Kansas to Oklahoma and vice versa in Coffeyville and its namesake on the south makes that locality an attractive rendezvous for criminals; and in the circles in which defendant moved he became acquainted with many of that sort of people. On occasion he had been able to do some of them a service. Thus he effected the release of the wife of James Lawson and a girl friend of Glen Roy Wright, who were held by the police of Coffeyville. He did this by the simple expedient of procuring the surrender of certain bonds and stocks which had been stolen from a motor sales corporation. There was some tes-

timony that on occasion criminals seeking to evade the officers of
the law were permitted to lie in hiding in the aviation hangar which
apparently was not fully used for aviation purposes, and was partly
used by defendant for the storage of hay and grain.

On the morning of January 9, 1933, James Lawson, Glen Roy
Wright, Harry Campbell, and Tommy Carpenter arrived in Coffey-
ville from Tulsa in an automobile. Their purpose was to rob the
office of the Union Gas Company. Carpenter, who was a stranger
in Coffeyville, left the car to see how many people were about that
office, and to learn if its vault was open. It had not yet been
opened, so he returned to the car, and the quartet drove to defend-
ant's residence in South Coffeyville. Lawson testified:

"When we arrived there we called for Tommy Hill, who came out. . . .
We all went into the house. We told him that we had come up to get the
Union Gas Company and had gone over to town and the vault was locked
and the manager was gone, and we did not know what to do. He said he
was glad we did not go against it, that there probably would not be any
money. He also said he would go over and see how things shaped up and
would come back and let us know."

Later in the same forenoon defendant visited the office of the
Union Gas Company, and then returned to the waiting robbers and
told them that "everything was all right and we [they] could go any
time we wanted to." Shortly after noon the quartet robbed the office
of the gas company of the sum of $2,544. The robbers drove out of
town, came to the hangar, drove inside and closed the door, with the
assistance of one Hendershott and others. Hendershott had been
put in charge of the hangar by defendant, who told him a couple of
boys would come along that afternoon to "hole up" in the hangar
and directed him to let them have it. Some time that afternoon or
evening defendant came to the hangar and the robbers gave him
$230 as his share of proceeds of the robbery. One of the robbers
testified that the amount taken was $2,360 (perhaps after deducting
a sum given to Hendershott), and that it was "a well-known fact
that where a man tells a thief about a place to make money, that
entitles him to his ten percent, regardless."

Eventually Lawson, Wright and Carpenter landed in the peniten-
tiary for this or other crimes. What became of Campbell does not
appear. Not until October 18, 1935, was a warrant sworn out for
defendant, charging him as a principal in the crime. The warrant
was served on November 20, 1935. His preliminary examination
was held on December 17, 1935; the information was filed on Jan-

uary 6, 1936; the cause was assigned for trial on January 23, and tried on that date and the next three days ensuing. The jury returned a verdict of guilty of robbery in the first degree. The motion for a new trial was overruled; and at the proper time and pursuant to notice to defendant it was shown by affidavits (which were not controverted) that he had theretofore been convicted of three prior and successive felonies; and he was accordingly sentenced to life imprisonment as a habitual criminal.

Defendant appeals, assigning various errors, the first of which relates to the overruling of his motion for a continuance. That motion was presented on January 6, at which time the court's attention was called to the long list of 70 witnesses whose names were endorsed on the information, a majority of whom were unknown to defendant. It was also shown that between December 17 and January 1, one of defendant's attorneys had been confined to his home on account of illness, and in consequence defendant had been unable to investigate the nature of the evidence to which that formidable array of witnesses might testify. Defendant concedes that the granting or refusal of a continuance is ordinarily addressed to the trial court's discretion, and that only a clear abuse of that discretion will constitute reversible error. (*State v. Wiswell*, 128 Kan. 659, 280 Pac. 780.) Defendant's contention is that the circumstances not only justified but required that the requested continuance should have been granted. Confronted with so many witnesses with whom a defendant has no acquaintance, if he is put on his trial on short notice, he may be prejudiced if they should give unexpected and damaging testimony against him; but apparently nothing of that sort happened in this case. On the motion for a new trial defendant made no showing that if he had been given more time to prepare for trial he could have shown that some of the witnesses against him were not worthy of credence, or that he could have adduced evidence to contradict their testimony. It must therefore be held that overruling the request for a continuance did not constitute prejudicial error. (*Farmers State Bank v. Crawford*, 140 Kan. 295, 37 P. 2d 14; *State v. Badgley*, 140 Kan. 349, 37 P. 2d 16.)

It is next contended that the evidence was insufficient to sustain the charge, and that the trial court should have directed the jury to return a verdict of not guilty. The particular point in this connection was that the crime charged against defendant was committed on January 9, 1933, and the complaint was not made until October

18, 1935, which was 2 years, 9 months, and 9 days thereafter; and that the state's evidence did not show defendant's absence from the state (or his concealment within the state) for an aggregate period of 9 months and 9 days; and consequently the action was barred by the pertinent provision of the criminal code (R. S. 62-503). We cannot assent to this contention. While the evidence did not show the exact number of days, weeks, or months defendant was absent from the state, it was abundantly shown that he ordinarily did abide at his home in South Coffeyville, Okla.; that his ordinary business activities were performed in Oklahoma; and that he was usually to be found in or about South Coffeyville. It was a fair inference to be deduced from the mass of persuasive facts in evidence that he had been outside the state of Kansas for a greater period than 9 months and 9 days; and that the question was one for the jury's determination, and not one to be disposed of by a court ruling as a matter of law.

In *In re Stewart*, 60 Kan. 781, 787, 57 Pac. 976, it was said:

"The question as to whether a prosecution for a crime is barred by the statute of limitations is one of fact, to be determined by the jury, and ought to be submitted to them under proper instructions with other questions in the case."

While the information showed on its face that it was brought more than two years after the commission of the offense, it also contained a sufficient allegation of defendant's absence from the state to toll the statute. (*State v. Rook*, 61 Kan. 382, 389-390, 59 Pac. 653.) In *In re Clyne, Petitioner*, 52 Kan. 441, 448, 35 Pac. 23, it was said that the better rule is that the complaint must be filed and the warrant issued within the period limited by the statute although the warrant cannot be served within the two years from the commission of the offense because of the absence or concealment of the accused. It hardly need be said that in the forty-four years since that dictum was written, our conceptions of the administration of the criminal law have changed (and, we trust, improved), and the courts of today are more inclined to interpret statutes so that they will accomplish their purpose rather than defeat it. (*State v. Fleeman*, 102 Kan. 670, 677, 171 Pac. 618; *State v. Clark*, 125 Kan. 791, 794, 795, 266 Pac. 37.) Indeed, the soundness of the dictum in *In re Clyne, Petitioner*, was challenged thirty-seven years ago in *State v. Rook*, 61 Kan. 382, 389-390, 59 Pac. 653. In *United States v. Norton*, 91 U. S. 566, it was held that a person could not be pros-

ecuted for the embezzlement of postal funds unless the indictment had been found within two years from the time the offense was committed. The present federal statute, which is more general in its scope, appears in 18 U. S. C. A. § 583. But at the time the above-cited case was decided it read:

"Nor shall any person be prosecuted, tried, or punished for any offense not capital, nor for any fine or forfeiture under any penal statute, unless the indictment or information for the same shall be found or instituted within two years from the time of committing the offense or incurring the fine or forfeiture aforesaid." (1 Stat. 119, § 32.)

Our statute which governs the time for the institution of prosecutions, other than for murder, or petty misdemeaners, has an important provision which did not appear in the federal statute. It reads:

"If any person who has committed an offense is absent from the state, or so conceals himself that process cannot be served upon him, or conceals the fact of the crime, the time of absence or concealment is not to be included in computing the period of limitation." (R. S. 62-504.)

To what limitation does this refer? To the time in which an action must be begun, to be sure. This court holds that the *dictum* in *In re Clyne, Petitioner,* which suggests that the complaint must be filed and the warrant issued within two years, without giving due significance to the exceptions stated in R. S. 62-504, is disapproved.

Defendant next contends that there was an inconsistency in the court's instructions, particularly between No. 9 and No. 11. Defendant approves of No. 9 *in toto,* part of which reads:

". . . Before you can determine the guilt or innocence of the defendant of the crime charged in the information, you must first determine whether or not the defendant has been absent, as such is hereinafter defined, from the state of Kansas, at any time for a period of more than nine months and nine days since the 9th day of January, 1933, and before the 18th day of October, 1935, the date of the commission of the alleged crime and the commencement of the prosecution herein respectively.

"In this connection you are instructed that 'absence from' means and is to be taken as away from, it means the personal departure of the defendant from the state of Kansas, so that process or a warrant could not be served upon him within the state of Kansas, during the two years after the date of alleged commission of the crime as charged in the information, to wit: January 9, 1933, such absence must be such that process or a warrant could not be served upon him within such time as to avoid the running of the statute, in this action nine months and nine days."

Instruction No. 11 reads:

"In order that a prosecution of this nature be barred by the two-year period of limitations the defendant must have been actually, physically present within the state of Kansas for a total period of time of not less than two years after the commission of the crime and prior to the commencement of the prosecution. All absences from the state must be aggregated and are not to be included in the computation and if you find that the defendant spent any time within the state of Kansas and was so concealed that service of process could not be had upon him the time of such presence within the state is also not to be included in the computation of time."

The latter instruction merely supplements No. 9 by explaining the effect of any concealment of defendant within the state upon the time within which the prosecution should have been commenced. There was some evidence that defendant had private quarters in Coffeyville, Kan., for which he paid rent under an assumed name, and which might have justified an inference that he was using it as a place of concealment. Be that as it may, this court cannot discern any inconsistency nor lack of clarity in the criticized instructions.

The next error urged relates to the admission in evidence of a statement made by defendant on the occasion of his arrest, November 20, 1935. It was taken down by the county attorney's stenographer; and included in that statement were certain Bertillon photographs and prison records of Lawson, Campbell, and Wright, who robbed the Union Gas Company office. The objection to this evidence in the trial court was that it was "irrelevant and immaterial," etc. The objection was not good. The entire statement given by defendant was admitted in evidence. When it was offered, the record reads:

"[Counsel for Defendant]: No objection, except that it is irrelevant and immaterial, not being shown to have been voluntarily made, and that no statement as to the constitutional immunities were made."

The statement was pertinent and candidly helpful on the question of the length of time defendant was absent from the state between the date of the robbery and the time of his arrest, thus:

"Q. Where do you live now, Tommy? A. I live in South Coffeyville, Okla.

. . . . . . . . . . . . . . . .

"Q. How long have you lived there? A. I lived there for—the last time I think it's been—damned if I know to be exact.

"Q. Several years? A. I have lived in South Coffeyville since the town opened, practically.

. . . . . . . . . . . . . . . .

"Q. Then the last two years you have been living in your house where you are now? A. Yes, sir.

"Q. How long have you operated the Casa Del down there at South Coffeyville? A. I was trying to think about that last night. I opened that up a short time after beer was legalized. When was that? We didn't have it quite ready when beer was legalized, the day beer was legalized.

"Q. That was in the late spring of '33? A. Well, sir, I don't know.

"Q. It has been two years ago? A. It has been longer than that. I was under the impression it was around three or four years since beer was legalized, '32 or '33.

. . . . . . . . . . . . .

"Q. Of course while you run that you gave that most of your time? A. Yes, sir. I stayed there most of the time.

"Q. Stayed there at the place most of the time? A. Yes, sir.

. . . . . . . . . . . . .

"Q. But where you sleep is in South Coffeyville? A. Yes.

"Q. Of course, you divide your time? A. The biggest parts, yes: The nights I always spend at home. We do all our trading in Coffeyville, Kan."

At the trial defendant took the stand in his own behalf, and the record reads:

"Q. Now, at the time you made the statement to me in response to my questions on the 20th day of November, 1935, in my office, you answered all the questions truthfully to the best of your ability, did you not? A. Yes, sir.

"Q. You were not threatened with anything, were you? A. No, sir.

"Q. You attempted to understand every question that you answered? A. I tried to; yes, sir."

We think the testimony just quoted makes it clear that defendant's statement was given without constraint.

It is also argued that defendant was prejudiced by the showing that he had such a wide acquaintance with convicts—with the consequent implication that he himself was a man of bad character. But it was on defendant's own direct examination that this subject was opened. He testified:

"My friend's name is Wilder. . . . Mr. Wilder lives in Joplin. . . . At Picher Mr. Robertson told me that he had been robbed of some bonds, that Mr. Wilder had told him that I knew a lot of the boys who were thieves around that part of the country, for they came to my place. I told him that I did. . . . Mr. Wilder had told him that I might be able to locate the robbers and get his property back. I told him I did not know whether I could or not. He then told me who it was who robbed him; one was Jimmy Lawson and the other was Glen Roy Wright. . . . I found Lawson and I told him that a man in Joplin from whom he had stolen some papers and bonds wanted them back. . . . I then made arrangements for Lawson to deliver the bonds. I waited quite a while and finally Lawson brought them to me, to South Coffeyville, right on the state line where I met him. . . .

I had already told Mr. Robertson that I would try to make the thieves pay a part."

There is nothing further under this assignment which requires discussion, and error does not appear.

The next error urged relates to the admission in evidence of a former plea of *nolo contendere* entered by defendant in the federal court at Fort Scott where he was being prosecuted for receiving stolen property. It appears that on arraignment he had first pleaded guilty but was permitted to withdraw that plea and file a *nolo contendere*. While the plea itself is not recognized under our local criminal code, its significance is familiar to the profession. Its evidential significance in later cases, civil and criminal, is well understood. In the federal practice a plea of *nolo contendere* cannot be used in a later civil suit to the prejudice of the defendant. (9 Hughes Federal Practice, § 7089.) In a later criminal case it cannot be used (*Tucker v. United States,* 196 Fed. 260, 41 L. R. A., n. s., 70) except on cross-examination. (*MacKnight v. United States,* 263 Fed. 832; *Fisher v. United States,* 8 F. 2d 979.) But in the state courts the rule is otherwise. In *State v. Radoff,* 140 Wash. 202, 248 Pac. 405, where a new trial was granted on account of the admission of incompetent testimony it was nevertheless held that evidence of a former conviction upon à plea of *nolo contendere* was competent. The court said:

". . . we find that the authorities generally hold that testimony of a conviction based upon that plea is subsequently properly admissible as against a person so convicted as affecting his credibility, although a conviction upon that plea has not in all respects the same effect as a conviction after trial or on a plea of guilty. (*State v. Herlihy,* 102 Me. 310, 66 Atl. 643; *State v. Conway,* 20 R. I. 270, 38 Atl. 656; *State v. Burnett,* 174 N. C. 796, 93 S. E. 473, L. R. A. 1918A 955; *State v. Henson,* 66 N. J. L. 601, 50 Atl. 468, 616; *Tucker v. United States,* 116 C. C. A. 62, 196 Fed. 260, 41 L. R. A., n. s., 70.)" (p. 205.)

In this state the rule as to the admission in evidence of the commission of other crimes is more elastic than in some other jurisdictions (*State v. King,* 111 Kan. 140, syl. ¶ 1, 206 Pac. 883; *State v. Gwynne,* 142 Kan. 13, 15, 45 P. 2d 849). The record of defendant's plea of *nolo contendere* was brought into this case on the cross-examination of defendant and it must be held that its admission was not erroneous. (*State v. Bigler,* 138 Kan. 13, 19, 23 P. 2d 598; *Fisher v. United States,* supra.)

Error is finally predicated on a remark of counsel for the state

in his argument to the jury in which he called attention to the diamond rings and fur coat of defendant's sister, who had testified in his behalf. Defendant's timely objection to that line of argument was promptly sustained.

"[Counsel for Defendant]: I ask that counsel be reprimanded.

"The Court: If you make another statement outside the record I will ask you to take your seat.

"[Counsel for State]: If the court please, I wish to apologize. I thought I was staying inside the record.

"The Court: There is no testimony where the diamonds came from and you will not be permitted to infer.

"[Counsel for Defendant]: Or that they were diamonds."

Since the trial court dealt with this incident so promptly and so emphatically, it could not be magnified into reversible error.

A careful perusal of the entire record fails to reveal anything that savors of prejudicial error, or that the verdict lacks support in the evidence, or that defendant did not have a fair trial; and the judgment is therefore affirmed.