No. 66,883

STATE OF KANSAS, *Appellee,* v. JAMES LYNDELL POOLE, JR., *Appellant.*

(843 P.2d 689)

Opinion filed December 11, 1992.

*John M. Duma,* of Kansas City, argued the cause and was on the brief for appellant.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by James Lyndell Poole, Jr., from his conviction of aggravated robbery, K.S.A. 21-3427. He was acquitted of felony murder.

Two issues are raised on appeal. The defendant contends the trial court erred in finding the prosecution's reasons for striking four black jurors were racially neutral and in giving an *Allen* instruction.

The issues raised on appeal do not focus upon the facts underlying the crime. The facts do come into play as background for the State's reasoning on striking certain jurors.

On April 28, 1990, at approximately 12:30 a.m., Sean Malloy, Sara Foulk, and their four-month-old son, Vincent, drove to a Price Chopper grocery store in Kansas City, Kansas. Sara Foulk and Vincent stayed in the vehicle while Malloy went into the store. Vincent was asleep in the back seat, and Sara Foulk was in the right front passenger seat. Poole and Jerrell Edward Larry stole the parked car and, in the process, Sara Foulk was shot. Malloy returned to find Sara Foulk lying on the ground and Vincent and his car missing. Vincent was located a few hours later on the front porch of a house across from the county jail. Sara Foulk subsequently died from the gunshot.

Both Poole and Larry were charged with aggravated robbery and felony murder with the underlying felony being aggravated robbery. The jury convicted Poole of the aggravated robbery charge and acquitted him of the murder charge. Larry pled guilty to felony murder.

Poole, who was sentenced to a term of 15 years to life, appeals his conviction.

## I. Peremptory Challenge

At the close of the voir dire process, Poole moved to discharge the jury, arguing the State exhibited purposeful racial discrimination in using peremptory challenges to remove four black venirepersons. Specifically, the defendant questioned the discharging of Wendell Mitchell, Anna Mariner, Grace Tolbert, and Richard Morsden. After hearing the State's reasons for striking those individuals from the jury panel, the trial court found that the State's reasons were racially neutral. Poole claims the trial court erred in so finding.

There were 8 black persons on the venire of 36. The prosecution struck 4, and 4 served on the jury of 12. Thus, blacks made up 22 percent of the venire and 33 percent of the jury. The defendant argues that if a black venireperson was struck without a race-neutral reason, it would not matter if the jury panel selected was 100 percent black because the constitutional right involved is the right of the juror or venireperson. Thus, he contends that if a 13th person is black and a race-neutral reason is not given for striking that person, there is error even though the jury ultimately is composed of 12 blacks. The defendant claims he is entitled to a new trial because this constitutional right was violated.

In *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court outlined a three-step analysis to determine if the State's use of peremptory strikes violates the Equal Protection Clause. The Supreme Court recently restated this analysis in *Hernandez v. New York,* 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991):

"First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [Citation omitted.] Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. [Citation omitted.] Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. [Citation omitted.]"

The State first contends Poole failed to establish a prima facie case because he failed to raise an inference that the State used its peremptory challenges to exclude those individuals because of their race. The State also notes that the trial court applied an incorrect standard to determine whether the defendant had established a prima facie showing. In *Hernandez,* 500 U.S. at 359, the United States Supreme Court stated that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." See also *U.S. v. Johnson,* 941 F.2d 1102, 1108 (10th Cir. 1991) ("At the outset, the first issue of whether a prima facie case of discrimination exists becomes moot whenever the prosecutor offers

a race-neutral explanation for his peremptory challenges and the trial court rules on the ultimate factual issue of whether the prosecutor intentionally discriminated."); *U.S. v. Day,* 949 F.2d 973, 978 n.4 (8th Cir. 1991); *Wylie v. Vaughn,* 773 F. Supp. 775, 777 (E.D. Pa. 1991).

In *Hernandez,* the Supreme Court reasoned: "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson,* the finding will 'largely turn on evaluation of credibility.' [Citation omitted.]" 500 U.S. at 365.

With regard to Wendell Mitchell, the State told the trial court it wanted jurors who could empathize with the 17-year-old victim who had a 4-month-old baby. The State asserted that Mitchell had been struck from the jury panel because he did not have any children and that those left on the panel had children. On appeal, the State adds that it was seeking jurors with a maternal or paternal instinct who would understand that the victim would not leave the vehicle when directed to do so at gunpoint because her baby was in the back seat.

The defendant contends that one of the venirepersons selected for the jury, Constance Mason, had no children. According to the transcript of the voir dire proceedings, Mason stated she was married with no children. Included in the record is an affidavit from Mason, which was never presented to the trial court, attesting to the fact that she had two children at the time of these proceedings and that she so testified on voir dire. The State also attaches its notes from voir dire to its brief. These notes indicate that Mason said she had two children. The State's notes, however, are not part of the record on appeal.

We do not consider affidavits and notes not offered at the trial court level. The trial court, however, heard the evidence and the prosecution's explanation that all the jurors who had been selected had children. Defense counsel and the trial court did not challenge that statement of fact, and the trial court's finding that explanation racially neutral is not clearly erroneous.

With regard to Anna Mariner, the State told the trial court that the State anticipated testimony involving Creekside Apartments. The defendant did testify that prior to going to Price Chopper, he and Jerrell Edward Larry spent 15-20 minutes out-

side one of the Creekside Apartments visiting and drinking with some of Larry's friends. The State pointed out that although Mariner did not give exact dates, she indicated she lived at Creekside Apartments about the time of the homicide.

During voir dire, Mariner stated she had never seen Poole at the apartment complex during the time she lived there. She also said she did not know Larry.

Poole points out that the following jurors were not struck from the panel: Robinson, who acknowledged familiarity with Creekside Apartments, and Bilberry, who lived close to the Price Chopper where the murder occurred. The defendant argues:

"It seems rather peculiar that the Prosecution would remove a Juror for having knowledge of an apartment complex that had very little to do with the case when there was another Juror who also had knowledge of the apartment [complex] in question that was not struck and further there was a Juror that lived nearby the actual scene of the murder that was not struck."

Robinson had been to Creekside Apartments just once. He gave a cub scout who lived there a ride home more than a year before the homicide occurred. Bilberry acknowledged living close to the scene of the murder, but said it would not affect her ability to be a fair and impartial juror. Bilberry was not asked further questions on the matter, and what she meant by close is unknown.

On appeal, the State argues that it was concerned Mariner might have been home the night of the homicide, might have seen the defendants or their friends that evening, or might know some of the defendants' friends. The State did not have a similar concern with Robinson or Bilberry.

With regard to Grace Tolbert, the prosecutor explained to the trial court that, even after requesting Tolbert to speak up, he still did not understand what she said and that she did not appear interested. The defendant acknowledges the State asked Tolbert to speak up, but argued to the trial court it was only one time and not three times. The State acknowledges that the record does not show Tolbert was requested to speak up. Neither defense counsel nor the trial judge took issue with the prosecutor's characterization of Tolbert's responses or with the number of times the prosecutor said he asked her to speak up.

The defendant argued to the trial court the fact Tolbert did not speak up and the fact she was soft-spoken were not "well-

grounded, articulate reasons to strike those members of a defined race from the jury." The defendant does not contend other venirepersons were soft-spoken and did not speak up or were treated differently than Tolbert.

This court has recognized body language as a potentially non-discriminatory reason to strike a venireperson.

"Hostility toward the prosecution, as evidenced by oral responses, tone of voice, sitting with arms crossed, leaning forward when defense counsel conducts voir dire, or leaning back while the prosecution asks questions, is a matter which the trial court may take into consideration in determining whether the prosecutor has a valid and neutral reason for striking the juror. . . . [T]he trial judge must be particularly sensitive when body language, alone, is advanced as a reason for striking a juror of [a cognizable racial group]." *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 (1989).

See *State v. Clemons*, 251 Kan. 473, Syl. ¶ 3, 836 P.2d 1147 (1992).

Although the reason given by the State is not one of those listed in *Hood*, there are similarities. For example, interest in the proceedings can be a subjective determination. Therefore, a trial court also should be "particularly sensitive" under these circumstances. Here, it is impossible to tell if the trial judge was particularly sensitive. The trial judge gave a blanket approval to the State's reasons and did not discuss the individual circumstances of the four venirepersons struck from the jury panel.

With regard to Richard Morsden, the State told the trial court that Morsden was struck from the jury panel because he is disabled and unable to work due to a back injury. The State expressed its reservations about putting someone on the jury with these problems because of the length and intensity of the trial.

The defendant's complaint with this reason is that when Morsden said he was disabled because of a back injury, the State did not ask Morsden about his back injury and whether this condition would present a problem in serving on the jury. When another venireperson asked to be excused because a prior accident was bothering her, the State asked if a padded seat would make a difference and if the pain had caused her to miss anything during voir dire. The venireperson stated her injury would not interfere.

The State maintains that a juror's physical condition is a non-racial concern. Consequently, the State contends it was not ob-

ligated to ask Morsden further questions because the State already had sufficient reason for striking him. Although the State's questioning of the two venirepersons differed, this alone does not establish a discriminatory purpose.

Clearly, the percentage of blacks on a venire panel and the percentage that ends up on the jury panel is not the determinative factor. It is, however, a relevant factor the trial court can consider in making the ultimate determination of whether there is proof of racially discriminatory intent or purpose sufficient to show a violation of the Equal Protection Clause. Here, the record supports that the trial court's finding was not clearly erroneous. Therefore, we will not disturb the trial court's finding that the State did not exhibit discriminatory purpose in its peremptory strikes.

## II. The "Deadlocked Jury" or *Allen* Instruction

During deliberation, the jury indicated it might not be able to reach a verdict. The trial court then gave the "deadlocked jury" or *Allen* instruction (PIK Crim. 2d 68.12) over the defendant's objection. Poole contends this instruction was error because it coerced the jury into a verdict.

In *State v. Oswald*, 197 Kan. 251, 260-61, 417 P.2d 261 (1966), we approved an *Allen*-type instruction, based upon the holding in *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896), but cautioned against its use after deliberations had commenced. If the instruction is given prior to deliberation,

"all question with regard to the coercive effect of the same would be removed. The practice of lecturing a jury in a criminal case after it has reported a failure to agree is not to be commended and . . . might well be held coercive and erroneous as invading the province of the jury." 197 Kan. at 261.

We have continued to emphasize the caution with which trial courts should give the *Allen*-type instruction during jury deliberations.

"The danger in giving an intimidating or coercive instruction arises when a jury has reported its failure to agree on a verdict. Under such circumstances a coercive instruction might induce a jury to return a verdict which they would not otherwise have reached." *State v. Hall*, 220 Kan. 712, 719, 556 P.2d 413 (1976).

In *State v. Troy*, 215 Kan. 369, 372-73, 524 P.2d 1121 (1974), this court held that although the trial court erred in giving an *Allen*-type instruction during deliberations, the error did not rise to the level of prejudice requiring reversal because of the overwhelming evidence against the defendant. See *State v. Boyd*, 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972); *Bush v. State*, 203 Kan. 494, 498-99, 454 P.2d 429 (1969); *State v. Hammond*, 4 Kan. App. 2d 643, 648-49, 609 P.2d 1171, *rev. denied* 228 Kan. 807 (1980).

In *Hammond*, the Court of Appeals commented:

"[T]he giving of an *Allen*-type instruction after the jury has deliberated for only 3 hours and 27 minutes, and particularly when the giving of same is objected to, is error. The error is compounded when the court calls the jury back less than one hour later and again prompts them. We do not here intend to set a time within which it would be error to give the *Allen* instruction, in that in each case it must be discretionary with the trial court. However, we have no hesitancy in saying that the shorter the period of deliberation has been, the more suspect is the giving of the instruction, and the more likely it is that the instruction will be coercive in nature. It may well be that there are cases with issues simple enough that such an instruction would be indicated within a few hours of deliberation; however, the instant case was not a simple one. We conclude the court abused its discretion." 4 Kan. App. 2d at 648-49.

Because of the overwhelming evidence against the defendant in *Hammond*, the abuse of discretion was not reversible error.

Here, the defendant was charged with aggravated robbery and felony murder, with the underlying felony being aggravated robbery. The jury convicted him of the aggravated robbery, but acquitted him of murder. Poole contends the verdict does not comport with common sense and shows that the verdict was coerced.

As illustrated by the discussion in *Hammond*, timing can be very important in determining prejudicial error. The record does not indicate when deliberations began, when the *Allen*-type instruction was given, if the trial judge made additional remarks, and when the jury reached its verdict. The defendant fails to provide a record from which we can determine whether prejudicial error occurred. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, an appellate

court presumes that the action of the trial court was proper." *State v. Milo*, 249 Kan. 15, Syl. ¶ 1, 815 P.2d 519 (1991).

Furthermore, there was overwhelming evidence that the defendant committed the aggravated robbery. Sean Malloy testified that after he parked his vehicle in the Price Chopper parking lot, he saw two black men who kept staring at his vehicle and seemingly were discussing the vehicle. The defendant's sister and her fiance both testified that after the crime had been committed, the defendant told them he had done something bad, he had never done anything like this before, and he acknowledged it was the murder at Price Chopper. Siblings of Jerrell Edward Larry and a friend of the Larry family all testified that the defendant and Larry both admitted their involvement in the crime. When the defendant testified, he admitted having been at the scene and previously having discussed trying to steal a car.

Poole fails to establish that the giving of the *Allen*-type instruction was reversible error.

Affirmed.