No. 76,483

STATE OF KANSAS, *Appellee*, v. UNDRA D. LEE, *Appellant*.
(948 P.2d 641)

Opinion filed October 31, 1997.

*Hazel Haupt*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Undra D. Lee, from his convictions by a jury of first-degree murder, aggravated kidnapping, aggravated assault, and kidnapping.

Lee contends that the trial court erred in not instructing on second-degree murder; that certain evidence was erroneously introduced at trial; that the statute of limitations had run on all charges except for the murder charge; and that reversible error occurred by reason of the State's peremptory strike of an African-American juror.

On May 31, 1994, human bones were found in a field in rural Sedgwick County. The remains were identified as those of Marqueta Smallwood, who had disappeared in 1993. The coroner concluded she had died as a result of multiple gunshot wounds.

When the facts are viewed as we are required to view them on appeal, they show the following: Lee ran a drug operation out of the home of Allen Brooks. Marqueta owed Lee drug money. Lee, James C. Sanders (Lee's uncle), and Glenn Whistnant went to Steven Alexander's home, and Sanders and Whistnant forcibly removed Marqueta. Sanders put a gun to Alexander's head and backed out of the home with Alexander in tow. (The kidnapping charge arose from this incident.) Roselyn Surratt, a friend of Marqueta's, was a resident of the Alexander home and was present when Marqueta and Alexander were removed from the home. (The aggravated assault charge arose from threats made to Surratt during this incident.) The aggravated kidnapping and first-degree murder charges arose because Marqueta was forcibly taken from Alexander's home and killed.

Marqueta was taken to Brooks' home, forced to disrobe, and questioned intensely for some 2 hours. Before being taken from the Alexander home, Marqueta admitted she had taken the drug money and said, "You might as well go on ahead and kill me." She was told, "That wouldn't be any problem." While at Brooks' home, Lee was angry, and Marqueta was upset and crying and requesting that she not be killed.

Marqueta was next taken to the field where her remains were ultimately located. In the field, another long conversation took place concerning the drug money. Lee then gave Marqueta permission to walk home. When she had walked some 150 yards away from Lee, Sanders, and Whistnant, Lee sent Sanders to bring her back.

Sanders testified that Lee had been discussing shooting Marqueta. Whistnant testified Lee had told him he was going to "waste Marqueta." Lee tried to get Whistnant to shoot Marqueta, but Whistnant refused.

After further discussion concerning the missing drug money, Marqueta again requested that she not be killed. Lee shot her and Marqueta fell down. Lee then walked up to Marqueta as she lay on the ground and shot her again.

## INSTRUCTIONS

Lee appeals the trial court's failure to provide the jury with instructions on the lesser included crimes of premeditated murder. Lee acknowledges the rule that a trial court's duty to instruct on a lesser included crime, even in a premeditated murder case, arises only if there is evidence upon which the accused might reasonably be convicted of the lesser offense. See *State v. Linn*, 251 Kan. 797, Syl. ¶ 5, 840 P.2d 1133 (1992). Lee alleges that there was evidence presented at trial which might have reasonably supported a conviction for second-degree murder.

In *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992), this court stated:

"The duty of the district court to instruct on a lesser included offense 'arises only where there is evidence upon which the accused might reasonably be convicted of the lesser offense.' *Seelke*, 221 Kan. at 675. Because reasonableness is an element of this test, there is some weighing of the evidence which occurs. A finding of sufficient evidence tending to show the lesser degree of the crime triggers the duty."

In later cases, we said:

"The defendant has a right to have the court instruct the jury on all lesser included offenses established by substantial evidence, however weak, unsatisfactory, or inconclusive the evidence may appear to the court. Even the unsupported

testimony of the defendant alone, if tending to establish such lesser offense, is sufficient to require the court to so instruct. However, the evidence must be substantial and there must be evidence which, when viewed in a light most favorable to the defendant, would justify a jury finding in accordance with the defendant's theory." *State v. Harmon*, 254 Kan. 87, Syl. ¶ 1, 865 P.2d 1011 (1993).

See *State v. Shortey*, 256 Kan. 166, Syl. ¶ 2, 884 P.2d 426 (1994).

Lee's evidence of second-degree murder is not substantial. Even when viewed in a light most favorable to Lee, the evidence is not enough to justify a jury finding that Lee did not act with premeditation or deliberation in shooting Marqueta. Either Lee or one of the men following his orders told Marqueta that it would not be a problem to kill her. Whistnant informed the police that Lee told him (Whistnant) that he (Lee) was going to "waste" Marqueta. Finally, Lee asked Whistnant to kill Marqueta in the field. When Whistnant refused, Lee did it himself. All of this evidence clearly indicates premeditation. Thus, in light of this evidence, Lee could not have reasonably been convicted of second-degree murder. As such, an instruction on the lesser included offense of second-degree murder was not necessary. The trial court did not err in failing to provide lesser included offense instructions.

## GUN AND DRUG EVIDENCE

Shortly before opening statements began, the defense realized that the State had several firearms behind its table. Most of the guns had been seized during a search of Brooks' drug house, executed pursuant to a warrant, which occurred 5 days after Marqueta's disappearance. One of the guns had been seized during a search of Lee's rented room when he was arrested for the crimes at issue. The defense objected to the presence of the guns, claiming that they had no real relevance to the case and that the very presence of the guns was prejudicial to Lee. The defense moved that the guns be taken out of the courtroom until the trial court had had an opportunity to rule on the admissibility of the guns. The trial court denied this motion. The trial court found that it would be cumbersome for the State to go outside the courtroom to get a gun each time it wanted to offer one of the guns into evidence. The court allowed the State to keep the firearms in the courtroom.

Further, the court ruled that it would allow the State to refer to the guns in its opening statement as long as the State had "a good-faith belief [that the guns could] be admitted into evidence."

Upon this ruling, the State presented its opening statement. The prosecution referred to Lee as a drug lord who ran his business from Brooks' drug house and who dominated the others because he had "control of the drugs." The prosecution then referred to the guns in its opening statement by stating: "Now, while the enforcers, G-Dog and Semaj, would be at the door watching for the police, armed—G-Dog usually with a sawed off shotgun and Semaj . . . armed with weapons that were bought for them by this man; 9 millimeters, Glocks, different kinds of handguns . . . ."

In its case in chief, the State also questioned some witnesses about the guns found during the searches. During Steven Alexander's testimony, the State showed him Exhibit 11, a sawed-off shotgun. Alexander testified that the gun looked similar to the one which was pointed at his head on the evening Marqueta disappeared, but that he could not be certain it was the same gun. Roselyn Surratt also testified, and she made a tentative identification of the gun, pointing out that the gun had tape on the handle, as did the one pointed at her on the night Marqueta disappeared. Whistnant, on the other hand, testified that Exhibit 11 was not the same sawed-off shotgun he used on the night in question. Whistnant testified that the gun he carried on the night of Marqueta's disappearance was a two-barrel shotgun, while the Exhibit 11 gun was an "over and under" shotgun. Vanessa Miller, another member of Lee's drug ring who testified for the State, identified Exhibit 11 as either the gun that was behind her as she sold drugs at Brooks' house or as the gun that Whistnant would carry.

During Vanessa Miller's testimony, the State asked her if she recognized anything on a panel of photographs. The photographs were of Brooks' drug house when it was searched. They depicted various evidence seized during the search, including guns and drugs. Lee objected to the pictures and to the line of questioning. The defense pointed out that Lee was not present when the search warrant was served and that there was no evidence tying the guns to Lee. According to Lee, any probative effect the evidence might

have was clearly outweighed by the inflammatory nature of the evidence. In response to Lee's objection, the State claimed the evidence was relevant to corroborate its witnesses' testimony that Lee was the head of a drug organization and that Marqueta was killed as a direct result of her involvement with the drug organization.

In addition to entering the guns and photographs into evidence, the State called Detective Alan Prince of the Drug Interdiction Unit as a witness. He testified about the specifics of the evidence found at the time of the drug raid. The defense counsel objected to the testimony, stating that the evidence brought in other crimes and wrongs attributed to Lee, thereby creating prejudice that outweighed the probative value of the evidence.

Detective Prince testified that the search of the drug house revealed a sawed-off shotgun in the dining room, a rifle in the garage, and a pistol in a coat in Brooks' bedroom. Detective Prince was permitted to testify about contraband and surveillance equipment found during the search. Detective Prince stated that 29 grams of crack cocaine and 10 firearms were seized.

On cross-examination, defense counsel asked if there was any evidence that Lee lived at Brooks' drug house. The detective responded that there was not.

The State also requested permission to introduce evidence that when Lee was arrested in April 1993, he had drugs in his car and a .22 caliber Ruger pistol under a mattress in his rented room. The prosecution wanted to introduce evidence of the pistol and its seizure because Marqueta was probably shot with a .22 caliber gun. The defense objected, claiming that the gun was irrelevant and that the evidence would be more prejudicial than probative. Finding that the evidence was relevant, the trial court permitted its admission.

The defense counsel points out that it is unclear what type of gun Marqueta was shot with or even what type of gun Lee was carrying that night. Sanders testified that Lee owned a .22 caliber pistol. However, Sanders testified that on the night Marqueta was shot, Lee carried a .9 mm Glock 17. Later on, Sanders claimed that the shot fired at Marqueta sounded like a .22. However, he

specifically stated that the gun had a blue steel finish and was not nickel plated. The Ruger found under Lee's mattress when he was arrested had a nickel finish, not a blue steel finish. Further, the caliber of the gun that killed Marqueta was never conclusively determined, although the policeman who testified was fairly sure one of the bullets was from a .22.

"Relevant evidence" has been defined as "any evidence having any tendency to prove a material fact. K.S.A. 60-401(b). 'To be admissible, evidence must be confined to issues but need not bear directly upon them.' [Citation omitted.]" *State v. Haddock*, 257 Kan. 964, 981, 897 P.2d 152 (1995).

Based on this definition, the State claims the evidence seized during the search of the drug house and Lee's rented room was relevant to the murder, kidnapping, and assault charges and was properly admitted into evidence. At the search of the drug house, the police found a sawed-off shotgun, two .9 mm pistols, a .22 caliber pistol, and drug paraphernalia. When Lee's rented room was searched, the police found a Ruger .22. The night Marqueta was killed, Whistnant had a .9 mm, Sanders had a sawed-off shotgun, and Lee had a .22. Alexander and Surratt testified that the shotgun found during a search of the drug house looked similar to the weapon pointed at them on the night in question. After Marqueta was kidnapped from her residence, she was taken to and questioned at Brooks' drug house, where the drug paraphernalia and guns were later found. Although there was some evidence indicating that the weapons found at the drug house were not the same weapons used on the night of the murder, there was also sufficient testimony indicating that these weapons were used in the murder and kidnapping. This testimony alone was enough to qualify the gun and drug evidence as relevant.

Further, the challenged evidence was properly admitted into trial because it corroborated the testimony of the accomplices. The evidence in question corroborated the accomplices' testimony regarding Lee's drug ring and their testimony that Marqueta owed Lee drug money. The evidence also corroborated certain testimony regarding the events of the evening, including who carried what type of gun.

" ' "[A] trial court's decision concerning the admissibility of evidence will not be disturbed on appeal absent a showing of abuse of discretion. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 11, 815 P.2d 528 (1991); see *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991). 'An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court.' *Enlow*, 249 Kan. 732, Syl. ¶ 9. This general principle applies to rulings on the relevancy of evidence. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967)." ' *City of Olathe v. Stott*, 253 Kan. 687, 700, 861 P.2d 1287 (1993)." *Shirley v. Smith*, 261 Kan. 685, 697, 933 P.2d 651 (1997).

" 'Subject to certain exclusionary rules, the "[a]dmissibility of physical evidence is within the sound discretion of the court and is to be determined by the court on the basis of its relevance and its connection with the accused and the crime charged." *State v. Beard*, 220 Kan. 580, Syl. ¶ 3, 552 P.2d 900 (1976). In *State v. Ji*, 251 Kan. at 15, we said:

"[W]hen a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it." ' " *State v. Bornholdt*, 261 Kan. 644, 659, 932 P.2d 964 (1997) (quoting *State v. Sexton*, 256 Kan. 344, 353, 886 P.2d 811 [1994]).

It is true the evidence was prejudicial to Lee, but it was not so prejudicial as to outweigh the probative effect of the evidence. See K.S.A. 60-445. The evidence of the guns and drugs seized during a search of the drug house and of Lee's rented room was properly admitted into evidence.

Further, K.S.A. 60-447 was not raised in the trial court, and evidence was not admitted pursuant to K.S.A. 60-455. The defendant herein did not request a limiting instruction and raised no objection to the lack of an instruction. Thus, the lack of 60-455 motion or a limiting instruction did not create reversible error. Lee is not entitled to relief on this issue.

The relevant evidence was admitted because it corroborated the accomplices' testimony. The defendant herein did not request a limiting instruction and raised no objection to the lack of an instruction. Thus, the lack of a limiting instruction did not create reversible error.

## STATUTE OF LIMITATIONS

K.S.A. 1996 Supp. 21-3106 provides in pertinent part:

"(1) A prosecution for murder may be commenced at any time.

. . . .

"(5) Except as provided by subsection (7), a prosecution for any crime not governed by subsection (1), (2), (3), (4), and (5) must be commenced within two years after it is committed."

This 2-year time period begins to run on the day after the offense is committed. K.S.A. 1996 Supp. 21-3106(8). The 2-year time period stops running when a prosecution is commenced by the filing of a complaint or information, an indictment is returned, and a warrant is delivered to the sheriff or other officer for execution. K.S.A. 1996 Supp. 21-3106(9).

The crimes Lee was charged with—murder, kidnapping, aggravated kidnapping, and aggravated assault—occurred sometime between January 3, 1993, and January 16, 1993. The 2-year statute of limitations for the charged crimes of kidnapping, aggravated kidnapping, and assault began to run on January 17, 1993, and expired on January 17, 1995. Such time limit did not apply to the charged crime of murder. Murder may be prosecuted at any time, regardless of the time elapsed since the commission of the crime. The complaint charging Lee with murder, kidnapping, aggravated kidnapping, and aggravated assault was not filed until February 27, 1995. A warrant for Lee's arrest was issued on that same day. Thus, the prosecution for the charged crimes of kidnapping, aggravated kidnapping, and aggravated assault was not commenced within 2 years of the commission of the crimes. However, this 2-year time period may be tolled under certain circumstances, including the accused's absence from the state. K.S.A. 1996 Supp. 21-3106(7)(a).

On September 6, 1995, the State filed a motion in limine, asking the trial court to find the 2-year statute of limitations as to the charged crimes of kidnapping, aggravated kidnapping, and aggravated assault had been tolled during the time that Lee had been out of the state between the commission of the crimes (January 16, 1993) and the filing of the complaint (February 27, 1995). Lee had been out of the state and in the custody of the federal government beginning November 10, 1993. He had been incarcerated in federal prisons in Missouri and Oklahoma from November 23, 1993, until his return to Kansas on April 10, 1995, to stand trial for the

crimes charged herein. Lee argued that his absence from the state was involuntary and thus could not be used against him to toll the running of the statute of limitations.

The trial court found that the question was one of law. It held that Lee's absence from the state tolled the running of the 2-year statute of limitations. The trial court stated:

"I've read all of these cases and I don't think that voluntariness is the test in this particular case, and even if volunteering was the test, one could reasonably argue that at least [the defendant's] voluntary actions were the cause of being taken out of the state into federal prison."

Lee appeals the trial court's ruling, arguing that his absence from the state could not be used to toll the running of the 2-year statute of limitations for the crimes charged against him because his absence was involuntary, not voluntary. In support of his position, he cites *State v. Houck*, 240 Kan. 130, 727 P.2d 460 (1986). In *Houck*, the State failed to prosecute the defendant until almost 3 years after the crimes had occurred. The State claimed that the defendant's absence from the state during part of this time tolled the 2-year statute of limitations. The defendant had been on parole in Kansas, and he asked for permission to move to Arkansas during the statute of limitations period. The defendant was under the joint supervision of Kansas and Arkansas parole officers during all the time that he was in Arkansas. Because of this joint supervision, the defendant contended that he was in constructive custody of the State. Thus, the defendant claims that he was never actually "absent" from the state and that the tolling provision was never activated. As such, the defendant asserted that the State's prosecution of him was barred by the 2-year statute of limitations.

This court disagreed with the defendant. This court held that the defendant was voluntarily absent from the state and that the 2-year statute of limitations was tolled during his absence. In so holding, the court stated: "Houck voluntarily sought leave to move to Arkansas. He left the state of his own free will and remained out of state as a personal choice during the period in question. He was not ordered to leave the state; he was granted permission upon his request." 240 Kan. at 136.

Further, Lee contends that this interpretation of the absence tolling statute, requiring voluntariness, is analogous to this court's interpretation of the concealment tolling statute. Under 21-3106(7)(c), the 2-year statute of limitations may be tolled if the fact of the crime is concealed. However, such tolling exception has been interpreted to require active, voluntary concealment of the crime by the defendant in order for the tolling to be effective, not passive involuntary concealment on the defendant's part. The defendant's conduct must have been "calculated and designed to prevent discovery of the crime charged; mere silence, inaction, or nondisclosure is not enough." *State v. Palmer*, 248 Kan. 681, 686, 810 P.2d 734 (1991). Since 21-3106(7)(c) requires *voluntary*, active concealment of a crime to activate the tolling process, Lee claims that 21-3106(7)(a) also requires *voluntary* absence from the state to activate the tolling process. Since he was not voluntarily absent from the state, but was involuntarily incarcerated in another state, Lee claims that his absence did not activate the tolling provision of 21-3106(7)(a).

As Lee points out, there is no allegation that the State did not know where to locate him during its investigation, nor is there any allegation that the State experienced difficulty in having Lee returned from the out-of-state federal penitentiary in order to stand trial. According to Lee, the only excuse offered by the State for filing the charges late was that it wanted to get the testifying accomplices "through the system" before charges were filed.

According to the State, it is irrelevant for tolling purposes whether Lee was voluntarily or involuntarily absent from the state, just as long as he was actually absent.

As we read 21-3106, it is unambiguous and only requires that "[t]he accused is absent from the state" in order to toll the statute of limitations, regardless of whether the absence is voluntary or involuntary. *State v. Hill*, 145 Kan. 19, 64 P.2d 71 (1937), supports our conclusion. In *Hill*, the defendant was charged with a crime more than 2 years after its occurrence. Thus, the defendant claimed that the statute of limitations for the crime had passed and argued that he could not be prosecuted for the crime. However, the defendant lived in South Coffeyville, Oklahoma. As such, the

prosecution claimed that the defendant was absent from the state and that his absence tolled the statute of limitations for the charged crimes. The state line runs through Coffeyville, separating it into South Coffeyville, Oklahoma, and Coffeyville, Kansas. The defendant came into Coffeyville, Kansas, on an almost daily basis, and his address and presence in South Coffeyville was common knowledge. Nevertheless, this court had no difficulty in holding the defendant was absent from the state of Kansas so as to toll the statute of limitations. Further, in *State v. Wyman*, 198 Kan. 666, 426 P.2d 26 (1967), this court held that where a defendant has been absent from the state, neither concealment of his person, nor of the crime itself, is required to toll the statute of limitations.

Absence from the state alone, regardless of whether the absence is voluntary, is sufficient to toll the statute in the majority of states. See *Grayer v. State*, 234 Ark. 548, 353 S.W.2d 148 (1962); *Scherling v. Superior Court*, 22 Cal. 3d 493, 149 Cal. Rptr. 597, 585 P.2d 219 (1978); *People v. Carman*, 385 Ill. 23, 52 N.E.2d 197 (1943); *Couture v. Commonwealth*, 338 Mass. 31, 153 N.E.2d 625 (1958); *State v. Williams*, 92 N.H. 377, 31 A.2d 369 (1943); *State v. Ansell*, 36 Wash. App. 492, 675 P.2d 614, *rev. denied* 101 Wash. 2d 1006 (1984). This also seems to be the majority rule when the accused is held in a prison out of state. See *Traxler v. State*, 96 Okla. Crim. 231, 251 P.2d 815 (1952).

If we adopted Lee's "voluntary absence" theory, an accused who voluntarily left the state for a noble reason (to care for elderly parents, to support a family, to be with family, etc.), would be in a worse position than an accused who commits another crime or crimes and involuntarily ends up incarcerated in another state because the voluntary absence would toll the statute of limitations against the defendant while the involuntary absence would not.

We believe our legislature has clearly spoken. We hold that an accused's absence from Kansas, due to incarceration in an out-of-state prison, tolls the running of the statute of limitations for criminal offenses until the accused is returned to Kansas. Thus, the State's prosecution against Lee for kidnapping, aggravated kidnapping, and aggravated battery is not time barred.

## PEREMPTORY STRIKE

Lee is African-American. The State exercised a peremptory strike and struck Mrs. P., the only African-American juror, thereby creating a monochromatic jury. Lee objected to the strike. The trial court ruled that the State provided a race neutral reason to strike Mrs. P. and upheld the strike as constitutional. Lee appeals the trial court's ruling and challenges the State's strike of Mrs. P. as an unconstitutional race-based strike. See *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

Mrs. P. was a widowed nurse with seven children. During voir dire, she stated that she was unsure about what effect a witness' admission to having used crack cocaine would have on her judgment of the witness' credibility. The prosecution asked: "Do you believe that the witnesses if they tell you they used crack cocaine, do you believe—will you judge their credit even though they will tell you they broke the law?" Mrs. P. responded, "That's kind of hard. I don't know. . . . I would feel like maybe if they did use it, they wouldn't be too truthful." On further questioning, the prosecution asked if the fact that a witness used drugs would affect the way Mrs. P. would judge credibility. Mrs. P. stated, "I don't think so."

Based on her responses, the State used a peremptory strike and struck Mrs. P. from the jury pool. The defense objected to the State's exercise of its peremptory strike. In response to this objection, the State claimed that Mrs. P.'s equivocal statements about how she would judge the credibility of drug users and sellers indicated that she had a problem with drugs and credibility; a problem that was qualitatively different from other jurors. The State also claimed that it struck Mrs. G., a Caucasian jury pool member, for the same reasons. However, the defense pointed out that other Caucasian venirepersons made responses that were very similar to Mrs. P.'s response, but they were not struck from the jury pool. On appeal, the defense specifically points to Juror C., a Caucasian juror, who was also a healthcare worker. She responded that she believed drug use had a negative impact on credibility. She stated, "I would be able to listen to what they had to say, but as far as

them taking drugs or being on drugs, even if it was now, I mean naturally they would lose a little bit of credit because they might be high while they are testifying for all I know." She then agreed that she would watch the demeanor of the witness and determine for herself whether she believed the witness. The State did not peremptorily strike Juror C for this response. Instead, Juror C served as an alternate juror. According to Lee, the only difference between Mrs. P., who was struck from the jury pool, and Juror C, who served as an alternate juror, was race, indicating that Mrs. P. was struck for a race-based reason.

The State argues that it was justified in striking Mrs. P. due to her potential refusal to see witnesses who use and sell drugs as credible. As the State points out, its case was built on the testimony of drug users and sellers. In a case supported by witnesses who admittedly sold and used drugs, the State wanted to try this case with jurors who would not discount out of the hand the testimony of its witnesses. Mrs. P. stated she did not know how she would judge the credibility of witnesses who sold and used drugs. Thus, the State claims it was focusing on credibility assessment issues, not race, when it struck Mrs. P.

"The appellate standard of review applicable to a trial court's ruling that the State did or did not act with discriminatory purpose in exercising a peremptory challenge under *Batson* is deferential to the trial court, regardless of whether the standard is phrased as 'abuse of discretion' or 'clearly erroneous.' See, *e.g., State v. Kingsley*, 252 Kan. 761, 772, 851 P.2d 370 (1993) (appellate review of a trial court's acceptance of the State's reasons as racially neutral for removal of juror 'is on the basis of abuse of discretion'). We endorse abuse of discretion as the phrase to describe the deferential standard to be applied. Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the trial court. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

. . . .

"*Batson* held that 'the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' 476 U.S. at 89. *Batson* outlined a three-step process for evaluating claims of discrimination in jury selection that 'permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process.' *Hernandez v. New York*, 500 U.S. 352, 358, 114 L. Ed.

---

2d 395, 111 S. Ct. 1859 (1991). The three-step analysis outlined in *Batson* and *Hernandez* was set forth in *State v. Poole*, 252 Kan. 108, 843 P.2d 689 (1992):

> ' "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [*Batson*, 476 U.S. at 96-97.] Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. [476 U.S. at 97-98.] Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. [476 U.S. at 98.]" ' 252 Kan. at 110 (quoting *Hernandez*, 500 U.S. at 358-59).

. . . .

"After hearing the State's explanations, and having observed the entire voir dire process, the trial court, under *Batson*, is to make a purely factual determination: Has the prosecution *purposefully* discriminated by exercising peremptory challenges against persons solely on account of their race? *Batson* and *Hernandez* make this point clear:

'As in any equal protection case, the "burden is, of course," on the defendant who alleges discriminatory selection . . . "to prove the existence of *purposeful discrimination*." [Citations omitted.] In deciding if the defendant has carried his burden of persuasion, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of *intent* as may be available." [Citation omitted.]' *Batson*, 476 U.S. at 93. (Emphasis added.)

The Supreme Court noted later in *Batson*, 'Since the trial judge's findings in the context under consideration here will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' 476 U.S. at 98 n. 21.

. . . .

"*Batson's* treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard, accords with our treatment of that issue in other equal protection cases. [Citations omitted.] . . .

'Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will "largely turn on evaluation of credibility." [Citation omitted.] In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. . . . [the evaluation of which] lies "peculiarly within a trial judge's province." [Citations omitted.]' . . . *Hernandez*, 500 U.S. at 364-65.

. . . .

"The *Batson* analysis avoids placing a determinative emphasis on any one factor. The primary decision on the question whether the State has acted with an unlawful

purpose is placed by *Batson* in the hands of the trial judge. The trial judge can objectively compare numbers or other facts and subjectively evaluate the credibility of the State's counsel in explaining the reasons for each challenged strike.

. . . .

" . . . The ultimate decision is on whether the State has purposefully discriminated. The trial court can consider any 'circumstantial and direct evidence of intent as may be available.' *Batson*, 476 U.S. at 93. The fact that a prosecutor strikes an African-American juror, supposedly for Reason A, but does *not* strike a white juror, who exhibited the same Reason A, is certainly *circumstantial* evidence that the State is purposefully discriminating against African-Americans. This kind of circumstantial evidence may be sufficiently compelling in some cases to convince a trial court that the State is purposefully discriminating and that its race-neutral reasons are pretextual. However, comparison-based circumstantial evidence should not be considered conclusive in every case, as a matter of law.

"Whether the State's reason is legitimate, or whether it is merely a pretext for a true discriminatory motive of seeking an all-white jury, should be evaluated based on all of the available direct and circumstantial evidence of intent. The similarity of white jurors who were not challenged should be included in the evaluation. Under the *Batson* framework, the trial court is given primary responsibility for making that evaluation. Appellate courts are to review the trial court's decision with deference." *State v. Walston*, 256 Kan. 372, 373-81, 886 P.2d 349 (1994).

Here, Lee made a prima facie showing that the prosecution had exercised a peremptory challenge on the basis of race because the State struck Mrs. P., leaving no African-American on the jury. The prosecution then articulated a race-neutral explanation for striking the juror in question. The prosecution explained that Mrs. P.'s equivocal statements about how she would judge the credibility of drug users and sellers indicated that she might have a problem accepting the State's case because it was built almost entirely on the testimony of drug users and sellers.

After hearing this explanation and having observed the entire voir dire process, the trial court then made a "sensitive inquiry" into the circumstantial and direct evidence to determine whether the prosecution purposefully discriminated by exercising peremptory challenges against persons solely on account of their race. The fact that the prosecution struck Mrs. P., an African-American juror, for credibility assessment issues, but did not strike Juror C, a Caucasian juror who exhibited similar credibility assessment problems,

was circumstantial evidence that the State was purposefully discriminating against African-Americans. This kind of circumstantial evidence may be sufficient to prove that the State's race-neutral reason for a peremptory challenge was pretextual, but it cannot be considered *conclusive* evidence in every case as a matter of law. Thus, the trial court properly avoided placing a determinative emphasis on this one factor. Instead, relying on both direct and circumstantial evidence, the trial court objectively compared the numbers and subjectively evaluated the credibility of the State's counsel in explaining the reason for the challenged strike. Upon such evaluation, the trial court made a finding of fact and ruled that the prosecution did not purposefully discriminate by exercising a peremptory strike against a person solely on account of her race. This finding turned largely on the trial court's evaluation of the prosecutor's credibility; thus, this court should give the trial court's finding great deference.

We do not think the trial court abused its discretion. From the record, the State only struck one African-American. The State's reason for striking this jury pool member is supported by the record and makes sense considering the State's case was based almost entirely on drug users and sellers. It is true that some other non-African-American jury pool members expressed the same credibility assessment concerns as Mrs. P. did. Some of these Caucasian persons were struck and some were not. The degree of each person's credibility concerns varied. Thus, the State had the discretion to strike only those persons who seemed to have the most problem believing drug users and sellers as credible witnesses. The State did not have to strike all venirepersons who expressed this credibility concern in order to remain within constitutional boundaries. Further, most other venirepersons who expressed this credibility concern only stated that drug use would be one factor in a witness' overall credibility and would not alone determine whether they believed the witness. From Mrs. P.'s answers, the State could not tell if this would also be the case with her or if she would consider drug use a determative factor in not believing a certain witness.

The trial court did not abuse its discretion when it ruled that the prosecution did not purposefully discriminate in its exercise of

its peremptory challenges. The trial court did not commit error when it denied Lee's objection to the State's peremptory strike of Mrs. P. This issue fails.

Affirmed.