No. 77,008

STATE OF KANSAS, *Appellee,* v. STACEY W. SPEED, *Appellant.*
(961 P.2d 13)

Opinion filed May 29, 1998.

*Willard L. Thompson, Jr.,* of Wichita, argued the cause and was on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: A jury determined that Stacey W. Speed was guilty of first-degree murder, felony murder, aggravated robbery, and aggravated kidnapping in the death of Victor Williams. He was sentenced to life on the first-degree murder charge, 170 months on the aggravated kidnapping charge, and 85 months on the aggravated robbery charge. The last two sentences were imposed to run concurrent with the life sentence. The defendant, both through counsel and in separate memoranda, raises numerous questions in this appeal. We affirm the convictions and sentence imposed.

Victor Williams owned a stereo shop in Wichita. On October 25, 1993, Williams' body was discovered in his duplex by his former manager and another employee. Williams had been stabbed six times, four times in the neck, with one stab wound perforating his jugular vein and another his carotid artery. One hand had duct tape on it and the other hand bore evidence of duct tape. Williams' garage door was open and his BMW was missing. His duplex had been ransacked. Fingerprints were taken at the scene, but none matched those of the defendant.

On October 30, 1993, the sheriff of Okmulgee County, Oklahoma, received a call from the sheriff's office of the neighboring county, Okfuskee County, Oklahoma, stating that the defendant's father had contacted the office. According to the defendant's father, the defendant had stolen his father's diary and address book and was driving a BMW automobile that the father believed to be stolen from a man who had been murdered in Wichita a few days earlier. The sheriff of Okmulgee County was notified that the BMW the defendant was driving had been found parked in a motel near Henryetta, Oklahoma. He had been further informed by the defendant's father that his son was a black male in the company of an older white female from Pittsburg County, Oklahoma, and that his son would be returning to the motel to pick up the BMW.

The sheriff of Okmulgee County found the BMW in a parking lot near the motel and, based on the VIN of the vehicle, discovered that it had been stolen from Victor Williams in Wichita and might be in the possession of the defendant. He parked out of sight near the BMW and, approximately 7 hours later, he and other officers were still on the stakeout when they saw a car driven by an older white female, with a young black male as a passenger, drive through the parking lot, turn around, and start to drive back out. The car had a Pittsburg County license tag, and when the sheriff stopped the vehicle, the white female ran towards the sheriff, stating, "I haven't done anything." He and the other officers approached the vehicle with guns drawn. When the driver, who was the defendant, identified himself as "Stacey," he was arrested for possession of a

stolen vehicle. A key later identified as belonging to the BMW was found on the defendant's person.

After the defendant was arrested and taken into custody in Oklahoma, Wichita authorities were allowed to question him about the murder in Kansas. The defendant invoked his *Miranda* rights, and the Wichita police officers stopped the questioning and began to leave. At that time, the defendant asked Ronald Johnson, a detective with the Okmulgee County sheriff's office, if he could talk to him. Since Johnson did not know anything about the occurrence in Wichita, he advised the defendant that at least one of the Wichita police officers would have to sit in. Permission was granted by the defendant. Although the defendant did not invoke his *Miranda* rights again, he claims he was confused and that his statements were coerced. During the trial, the statements of the defendant were admitted during the State's case through Officer Landwehr of the Wichita Police Department.

Landwehr testified that at first the defendant told him that the BMW he was driving was owned by a friend, Kenny Walker, and that they were both driving it to Oklahoma City. When told that his story was not believable, the defendant admitted that Walker did not really exist and stated that a person named Arthur Sargent drove him to Henryetta, Oklahoma, and that he had permission to use the BMW from Alan Keith Copridge. Copridge has been convicted of felony murder, first-degree murder, aggravated robbery, and aggravated kidnapping in the death of Williams. We reviewed and affirmed his conviction in *State v. Copridge*, 260 Kan. 19, 918 P.2d 1247 (1996).

According to Landwehr, the defendant then told a different story. He stated that he had been contacted by Copridge and another person named Slim and asked by Copridge to drive Copridge's car to Williams' duplex, where Copridge and Slim were to pick up another car. The defendant told Landwehr that he waited for 40 minutes, but as Slim and Copridge came out, he got scared and drove away. Copridge and Slim then contacted the defendant at the house of the defendant's girlfriend, and Copridge and Slim took stereo equipment from the BMW before loaning the BMW to the defendant to take to Oklahoma.

The defendant's story then changed for a final time. The defendant told Landwehr that he went to Williams' duplex with Copridge to watch television. An argument ensued between Copridge and Williams, at which point Williams brandished a knife. The defendant fled and drove to his girlfriend's house, where he was later contacted by Copridge. In a statement to Landwehr, the defendant denied knowing that there was a robbery or homicide when he went with Copridge to Williams' duplex.

The defendant was not tried immediately upon the charges giving rise to this appeal because he was charged in Oklahoma with possession of a stolen automobile, convicted, and served 2 years in prison. Upon the expiration of the Oklahoma sentence, he was then charged in Kansas in 1995 with the murder of Williams.

A key witness at the defendant's trial was John Stevens, a friend of Copridge. Stevens testified that in October 1993, he was approached by Copridge, who wanted him to help steal stereo equipment. The defendant objected to any statements made by Copridge as hearsay, but the district court overruled the objection on the grounds that Copridge was present and available for cross-examination. Stevens spoke to Copridge on Saturday, October 23, 1993, and again Copridge tried to convince Stevens to help him steal stereo equipment, saying that the theft would take place that evening. Copridge also told Stevens that the victim knew Copridge but that Copridge would take care of it so the victim would not identify him.

The next day, Stevens again talked to Copridge, who told him the theft had not occurred the night before because the victim was not home. Stevens told Copridge he did not want to participate in stealing the equipment, but he did agree to let Copridge use his garage to strip the stereo from the victim's Blazer which Copridge wanted to steal.

Stevens testified that he heard no more about the robbery until the following Tuesday, when he heard on the radio that a stereo shop owner named Victor Williams had been robbed and murdered. He immediately went to the police and told them about Copridge. A few weeks later, Copridge telephoned him from the jail and mentioned the defendant's name.

Benjamin Amaro, Jr., also testified on behalf on the State. He had known Copridge for 10 years and also knew the defendant. He testified that on Sunday, he and Copridge had been at Copridge aunt's house when the defendant knocked on the door and asked to speak to Copridge. Copridge, the defendant, and another person spoke to each other outside the house, and then Copridge took Amaro home. Copridge asked Amaro if he would hold stereo equipment from a job that they were going to pull, and Amaro agreed.

Amaro testified that at 4 a.m. on Monday, the day Williams' body was discovered, Copridge knocked on Amaro's door. Amaro noticed that a BMW and a Pontiac Grand Am were parked outside. The defendant was standing next to the BMW. Copridge took stereo equipment from the BMW, gave it to Amaro, and left with the defendant. The next day, Copridge returned to pick up the stereo equipment, and they both took the equipment to Copridge's grandmother's house. As they were riding around, Copridge told Amaro that he shot Williams.

The State called Lionel Sanders to testify. Sanders knew both Copridge and the defendant, although he was better friends with the defendant. Sanders testified that the defendant told him that the defendant and Copridge were going to steal a Bronco or Blazer from Williams' stereo shop. The defendant told Sanders that he was going to take the vehicle to Oklahoma and sell it. The participants were to be the defendant, Copridge, and another person named Slim. The defendant told Sanders that he would just drive the car. Sanders testified at the trial that he was with the defendant at Copridge mother's house when he heard the defendant and Copridge talking. From what he overheard, it sounded as if they were making plans to steal Williams' vehicle.

Prior to trial, the defendant sought to suppress his statements given to the police. After a full hearing, the trial court denied his motion. Prior to the defendant putting on his case, the court again held a hearing on whether the defendant would testify. The trial court told the defendant that he had a right to testify or not to testify, and that it was his choice. The defendant stated that he did not want to testify "at this time." The trial court informed the

defendant that he had to make up his mind whether he was going to testify. The defense counsel explained that if the defendant was able to get his alibi witnesses into court, he would not testify, but if the witnesses were unavailable, the defendant would testify.

The defendant's girlfriend, Darlina Sargent, testified that she was picked up around midnight Sunday evening by the defendant and Sanders. They dropped Sanders off at his home and went to her house. She stated that as they arrived, Copridge also arrived at the residence. The defendant's girlfriend testified that after she went to bed, the defendant came back into the house and left again. However, she testified the defendant had returned to the house a little after 2 a.m., when she was awakened by her brother, Arthur Sargent, coming home. Sargent was called as a rebuttal witness and testified that he came home sometime after 2 a.m. and saw his sister on the couch but did not know if the defendant was there. He admitted that he had earlier told the detectives he had not seen the defendant when he returned home.

The defendant was convicted of both first-degree murder and felony murder by the jury as well as aggravated robbery and aggravated kidnapping. Other facts necessary for a disposition of the issues raised by the defendant are set forth within the opinion.

## SUPPRESSION OF DEFENDANT'S PRETRIAL STATEMENTS

The first set of issues involves the defendant's claim that the trial court erred in failing to suppress his statements to the police. The defendant argues that Detective Johnson in Oklahoma tricked him by pretending to be his friend and that Detective Johnson and Landwehr badgered, threatened, and coerced him and made assertions that he would be forced to go to Wichita and face the friends of Copridge who might do him harm, and if he confessed, he would be allowed to stay in Oklahoma. He also contends that the conduct of Detective Johnson after he had invoked his right to remain silent was the "functional equivalent of interrogation." He further asserts that several comments made by him during the interrogation constituted a request that the questioning cease or that counsel be provided. He requests that this court adopt a rule that

any unrecorded conversation between a defendant and a police officer requires suppression of any statement given by the defendant, whether voluntary or not. Finally, the defendant claims that the statements were the product of an illegal stop.

We begin with the claim by the defendant that the sheriff of Okmulgee had no reasonable, articulable suspicion to pull the car over in which the defendant was riding and, thus, any statements given after that point by the defendant should be suppressed. We find no merit in this contention.

At the time the defendant was stopped, the sheriff had knowledge that the BMW had been stolen from a murder victim in Wichita, the defendant had stolen the vehicle based on a report from his father, the defendant had parked the vehicle in a motel parking lot, and the defendant would be returning to obtain the BMW while riding with an older white female. It is clear the sheriff of Okmulgee had a reasonable, articulable suspicion that the person in the car was in fact the defendant and, thus, involved in criminal activity, *vis.*, the possession of a stolen vehicle. Therefore, the sheriff of Okmulgee had probable cause to arrest the defendant. See K.S.A. 22-2402(1); *United States v. Hensley*, 469 U.S. 221, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985); *State v. Johnson*, 253 Kan. 356, 368, 856 P.2d 134 (1993).

The evidence does not support the defendant's contention that Detective Johnson tricked the defendant or that he was coerced, badgered, or threatened by the Wichita police officers. Recently, in *State v. Banks*, 260 Kan. 918, 923, 927 P.2d 456 (1996), we stated:

"'Under the Fourteenth Amendment due process voluntariness test, a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will'" (quoting *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 [1986]).

The facts relevant in deciding whether a confession is a product of free will of an accused include (1) the accused's mental condi-

tion; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background, and (5) the fairness of the officers in conducting the interrogation. 260 Kan. at 923. A statement may be considered voluntary if the accused was not deprived of his free choice to admit, deny, or refuse to answer. 260 Kan. at 923-24. Voluntariness of a confession is determined from the totality of the circumstances, and where a trial court conducts a full prehearing on the admissibility of extrajudicial statements by an accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts should accept that determination if supported by substantial competent evidence and not attempt to reweigh the evidence. 260 Kan. at 923.

The defendant claims that the detectives used Detective Johnson as a "Trojan horse" to befriend the defendant and then entice him into a confession. However, the activity of Detective Johnson, from our reading of the record, fails to support the defendant's contention. It is undisputed that he told the defendant he knew the defendant's relatives. Also, during the interrogation of the defendant, Johnson encouraged the defendant to tell the truth and not to be afraid of Copridge. Such activity falls far short of the activity in cases cited supporting the defendant's contention. See *Span v. New York*, 360 U.S. 315, 318-19, 3 L. Ed. 2d 1265, 79 S. Ct. 1202 (1959); *People v. Blasingame*, 412 N.Y.S.2d 153, 65 A.2d 455 (1978); *Macon v. Commonwealth*, 187 Va. 363, 46 S.E.2d 396 (1948). In *Spano*, the police denied the suspect's continued request for an attorney. In *Blasingame*, the suspect was a 17-year-old boy who was in custody for 13 hours and questioned by an officer who was a friend of the family and who was further denied an opportunity to consult with an attorney. In *Macon*, the sheriff enticed the suspect to take a car ride with him, whereupon the sheriff and the district attorney, both of whom the suspect had known well for 20 years, advised her that the best thing for her to do would be to confess that she had killed her ex-boyfriend.

In this case, Detective Johnson denied the defendant's contention that he kept trying to get him to talk to the other detectives

or that he told him his relatives would be disappointed if he did not talk. We are not in a position to reweigh the evidence, and the trial court, based upon substantial competent evidence, determined that Detective Johnson's statements were more credible.

The defendant also contends that Detective Johnson's conduct was deceptive and that it promised leniency in order to coerce his confession. He relies on *State v. Thaggard*, 527 N.W.2d 804 (Minn. 1995). In *Thaggard*, the Minnesota Supreme Court noted that the use of trickery and deceit by police officers may invite suppression when the police used promises in seeking to persuade a suspect to confess to a crime. However, the court in *Thaggard* found no coercion where the suspect was not promised he would be free of prosecution if he confessed. 527 N.W.2d at 811-12. While the defendant argued that he was subjected to false promises, a review of the record reveals no such promises were made.

Based upon the totality of circumstances, including the fact that the defendant was not in a mental condition which would be more susceptible to coercion; the interrogation was not overly long or overly coercive; there was no suggestion that the ability of the accused to request to communicate with the outside world was compromised; or that the defendant's age, intellect, or background played any part in his confession, we conclude that the trial court's determination that the statements were voluntary is supported by substantial competent evidence.

As for the defendant's claim that Detective Johnson's statements were the functional equivalent of interrogation, the testimony was conflicting. While the defendant claimed that Detective Johnson attempted to get him to talk about the case and told the defendant that his family would be disappointed if he did not talk about the case, Detective Johnson denied he engaged in any such conduct. Instead, Detective Johnson stated that he came back in the room to get coffee, at which point the defendant asked to talk to him about the case.

In determining whether the trial court's determination on a motion to suppress is supported by substantial competent evidence, an appellate court must accept as true the evidence and all inferences to be drawn therefrom supporting the finding of the trial

court. *State v. Straughter*, 261 Kan. 481, 488, 932 P.2d 387 (1997). Applying this standard to the evidence, we conclude that the statements of Detective Johnson were not the "functional equivalent of interrogation." The defendant claimed that Detective Johnson should have known that his coming into contact with the defendant would result in the defendant making an incriminating statement because both he and the defendant were black and because Detective Johnson had earlier indicated that he knew relatives of the defendant. However, such conduct is far removed from the authority cited by the defendant in *Stewart v. United States*, 668 A.2d 857 (D.C. 1995). In *Stewart*, the officer had known the defendant since his childhood and attended the defendant's church. The officer went to the defendant's cell, gave him words of encouragement by telling him that everyone makes mistakes, and then asked him if he wanted to talk about the crime. Under these circumstances, the court held that such action was the functional equivalent of interrogation. 668 A.2d at 867-68. There is no evidence in the record to support the conclusion that Detective Johnson's conduct or statements were the "functional equivalent of interrogation" within the meaning of *Rhode Island v. Innis*, 446 U.S. 291, 302-03, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980).

Finally, the defendant asserts that he continued to invoke his rights during the interrogation but he fails to point to any exact statements he made. He does mention that at one point he told the officers to take him to Sedgwick County and another time to take him to the judge. He contends that several of his statements made during interrogation constitute requests that questioning cease or that counsel be provided.

Our review of the defendant's taped statement revealed that at one point he stated: "And since we're not getting anywhere I just ask you guys to go ahead and get this over with and go ahead and lock me up and let me go and deal with Sedgwick County, I'm ready to go to Sedgwick County, let's go."

We have held that when a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify but it is not required by the interrogator to

clarify, and the interrogator may continue questioning. *State v. Morris*, 255 Kan. 964, Syl. ¶ 4, 880 P.2d 1244 (1994). In this case, the defendant made no unequivocal statement that he wished to remain silent or confer with counsel. Thus, we conclude the trial court did not err in admitting the defendant's statements.

Turning now to the defendant's argument that his statements should be inadmissible because the conversation with Detective Johnson prior to giving the statements was not recorded, we note that it has never been the law in Kansas that conversation between a suspect and a police officer during interrogation that is not recorded is not admissible. While other states have established such a bright line rule, see *State v. Thaggard*, 527 N.W.2d at 807, the majority of jurisdictions have specifically declined to adopt such a rule. See *People v. Raibon*, 843 P.2d 46, 48-49 (Colo. App. 1992); *Coleman v. State*, 189 Ga. App. 366, 375 S.E.2d 663 (1988); *State v. Kekona*, 77 Hawaii 403, 886 P.2d 740 (1994); *State v. Rhoades*, 121 Idaho 63, 73, 822 P.2d 960 (1991); *People v. Everette*, 187 Ill. App. 3d 1063, 1075, 543 N.E.2d 1040 (1989); *State v. Buzzell*, 617 A.2d 1016, 1018 (Me. 1992); *Commonwealth v. Fryar*, 414 Mass. 732, 742 n.8, 610 N.E.2d 903 (1993); *Williams v. State*, 522 So. 2d 201, 208 (Miss. 1988); *Jimenez v. State*, 105 Nev. 337, 775 P.2d 694 (1989); *State v. Gorton*, 149 Vt. 602, 606, 548 A.2d 419 (1988); *State v. Spurgeon*, 63 Wash. App. 503, 508-09, 820 P.2d 960 (1991). By this decision we adhere to and follow the majority rule.

## TIME DELAYS

The defendant raises several issues in this appeal concerning a delay in bringing him to trial. The charges the defendant were convicted of arose out of an incident in 1993. The defendant was arrested in Oklahoma and charged with possession of a stolen vehicle, tried, and sentenced to 2 years. Upon the expiration of his sentence, the defendant was returned to Kansas in 1995 for trial on the charges before the trial court. He first contends that the delay in bringing him to trial violated his due process rights. He argues that the failure to charge him and bring him to trial for 2 ½ years was unreasonable. However, the defendant did not raise this issue before the trial court. Thus, he is considered to have

waived his argument. See *State v. Alderson*, 260 Kan. 445, Syl. ¶ 7, 922 P.2d 435 (1996).

Moreover, while the defendant claims he suffered prejudice by reason of the delay, there is no support for his claim in the record. The defendant argues in his brief that he suffered the loss of a necessary witness without detailing which witness he lost or how the delay contributed to the loss of such witnesses. The defendant also claims that he should be allowed an evidentiary hearing to present his reasons why he feels the delay prejudiced him. In support of this contention, he cites *State v. Bryson*, 500 P.2d 1171 (Hawaii 1972). In *Bryson*, the Hawaii Supreme Court found that where a defendant originally claimed a speedy trial violation and alleged prejudice from preindictment delay, an evidentiary hearing was needed to determine if the delay prejudiced the defendant under *United States v. Marion*, 404 U.S..307, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971). However, in *Bryson*, the reason the trial court failed to hold an evidentiary hearing on prejudice to the defendant under the *Marion* standard is that the defendant did not raise the issue. Even now, the defendant is unable to articulate with any particularity the prejudice he claims to have suffered. The defendant attempts to do so in his additional memorandum filed pro se before this court. However, his claim of prejudice appears to be simply that waiting to deal with the charges caused him emotional distress and wore him out. No prejudice to his fair trial was argued, and under the facts the defendant does not meet the standards set forth in this state in *State v. Royal*, 217 Kan. 197, 201-02, 535 P.2d 413 (1975), or the standard set out in *United States v. Marion*.

Second, the defendant contends that his Sixth Amendment right to a speedy trial was violated by the preindictment delay. However, in *Marion*, the Supreme Court determined that the Sixth Amendment did not apply to delay which occurred prior to the arrest of the defendant. 404 U.S. at 313-20. Although the defendant argues that he had previously been arrested in Oklahoma, the arrest was for possession of a stolen car, a crime with which he was not charged in Kansas. He was not arrested in Kansas until after his release in Oklahoma. Under these circumstances, the right to a speedy trial under the Sixth Amendment does not apply.

The defendant finally contends that the trial court erred in failing to dismiss the aggravated robbery charge and the aggravated kidnapping charge on the grounds that the statute of limitations had run. Prosecution in this case was commenced on December 18, 1995, well outside of the 2-year statute of limitations for these crimes provided in K.S.A. 21-3106. However, the trial court determined that the statute of limitations was tolled because the defendant was absent from the state; specifically, he was in Oklahoma from October 30, 1993, to December 18, 1995.

K.S.A. 21-3106(5) provides for a 2-year statute of limitations for aggravated robbery and aggravated kidnapping. However, under the provisions of K.S.A. 21-3106(6)(a), the period specified shall not include any period in which the accused is absent from the state.

The defendant argues that his absence from Kansas was not voluntary and, therefore, should not have tolled the running of the statute of limitations. However, most recently in *State v. Lee*, 263 Kan. 97, 105-08, 948 P.2d 641 (1997), we addressed the same question and resolved it adversely to the defendant's contention in this case. Lee contended that because he was incarcerated in the federal penal system, he was not absent voluntarily from the state and, therefore, the statute of limitations should not be tolled. 263 Kan. at 105-06. We stated: "As we read 21-3106, it is unambiguous and only requires that '[t]he accused is absent from the state' in order to toll the statute of limitations, regardless of whether the absence is voluntary or involuntary." 263 Kan. at 107.

## HEARSAY STATEMENTS OF ALAN KEITH COPRIDGE

The defendant argues that admission of the statements made by Copridge, who was also charged with and convicted of the murder of Williams, to John Stevens and Benjamin Amaro, Jr., on the grounds that Copridge was in the courtroom and was subject to being called by either party, was error. He argues that the failure of Copridge to testify at trial denied him the right to confront witnesses.

Stevens and Amaro testified that Copridge approached them and asked them if he wanted to help Copridge steal stereo equipment

from Williams. When Stevens asked how Copridge would be able to steal from someone he knew, Copridge stated he would "take care of it." Amaro testified that Copridge asked him to hold some of the stereo equipment for him.

In *State v. Fisher*, 222 Kan. 76, Syl. ¶ 5, 563 P.2d 1012 (1977), we held that a declarant must testify at trial before hearsay evidence of his or her out-of-court statement may be admitted under K.S.A. 60-460(a), which was the exception relied upon by the court in admitting Copridge's statement to other witnesses. We later modified *Fisher* in *State v. Davis*, 236 Kan. 538, 541, 694 P.2d 418 (1985), wherein we held that if the declarant is actually present and testifies at trial, the statements are admissible whether admitted before or after the declarant testifies.

In the instant case, Copridge, the declarant, was not called to testify and, therefore, admitting the hearsay statements under the provisions of K.S.A. 60-460(a), as the trial court did, was error. However, the State contends that such statements were admissible under the provisions of K.S.A. 60-460(i)(2), which provide an exception to the hearsay rule for those statements which would be admissible if made by the declarant at the hearing if the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter, and was made while the plan was in existence and before its complete execution or termination. In interpreting this provision, we have held statements to be admissible under this exception where there is evidence other than the proffered out-of-court statement which establishes a "substantial factual" basis for a conspiracy between the defendant and the declarant. *State v. Butler*, 257 Kan. 1043, 1060, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996).

In this case, there was substantial evidence, absent the statements of the declarant, that the defendant and Copridge were involved in a conspiracy to rob Williams. Lionel Sanders testified that the defendant told him that the defendant, Copridge, and Slim were going to steal a sports utility vehicle belonging to a person who owned a stereo store. All of the alleged hearsay statements by Copridge were related to this conspiracy and were made while the

conspiracy was still in existence. Thus, they were admissible under the coconspirator exception to the hearsay rule. K.S.A. 60-460(i)(2). Although the trial court may have erred in admitting such statements under K.S.A. 60-460(a), K.S.A. 60-460(i)(2) provided a basis for their admission, and it was not error for the trial court to admit the same.

## REPRESENTATION OF COUNSEL

The defendant raises three contentions in regard to his representation: (1) The trial court erred in denying his application for a new attorney; (2) the trial court erred in denying an evidentiary hearing on ineffective assistance of counsel; and (3) the court erred in preventing him from representing himself.

(1) The denial of the defendant's application for new attorney

On April 17, 1993, the defendant filed a pro se "application for reassignment of counsel" in which he asked for a new attorney on the basis that a conflict of interest existed because the public defenders were employees of the State, one of his attorneys had an excessive workload, a communication gap existed between himself and one of his attorneys, his attorneys had ignored his request for investigative services and production of evidence, and his attorneys had withheld information from him.

The record fails to support any of the above contentions, and the defendant's claim is without merit. Generally, the question of whether a new counsel should be appointed is left to the discretion of the trial court. *State v. Hegwood*, 256 Kan. 901, 903, 888 P.2d 856 (1995). To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel. Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the attorney and the defendant. 256 Kan. at 903-04.

The defendant argues that his attorneys were from the public defender's office and, thus, paid by the State. We rejected the exact same argument in *State v. Ferguson*, 254 Kan. 62, 66-67, 864 P.2d 693 (1993), wherein we noted that any appointed counsel suffers

from the same problems and that this fact does not deny the defendant a fair trial.

The defendant claims that his attorneys had an excessive case load. However, the trial court questioned the defendant's attorneys, who stated that although they had a large case load, they had spent considerable time on the defendant's case and were ready to proceed.

The remainder of the defendant's assertions regarding this allegation concern communication gaps between him and his appointed counsel. Although the defendant makes such assertions, these assertions do not show a complete breakdown in communication occurred. In *State v. Collier*, 259 Kan. 346, 358, 913 P.2d 597 (1996), we held that as long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid and a fair presentation of a defense, the court is justified in refusing to appoint new counsel. Based upon the above circumstances, we conclude the trial court did not abuse its discretion in denying the defendant's motion.

## (2) Ineffective assistance of counsel

"Before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel's performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *State v. Orr*, 262 Kan. 312, Syl. ¶ 1, 940 P.2d 42 (1997).

At the sentencing hearing, the defendant brought up numerous issues relating to the competency of his counsel. He asserted that this counsel was too busy to adequately represent him at trial and that his counsel failed to introduce evidence relating to his character. The defendant also claimed his counsel should have called Cortez Loudermilk because Loudermilk was at the victim's residence on the night in question. The defendant also asserted that his counsel should have called other witnesses, including Copridge.

He further claimed that his counsel also failed to allow him to be present during the instruction conference. Finally, he complained that his counsel had failed to attempt to get the aggravated robbery and aggravated kidnapping thrown out as beyond the statute of limitations.

The trial court, having presided over the trial, concluded that an evidentiary hearing was not necessary and denied the defendant's motion alleging ineffective assistance of counsel. Both the performance and prejudice prongs of an ineffective assistance of counsel inquiry are generally mixed questions of law and fact on appeal. *State v. Orr*, 262 Kan. 312, Syl. ¶ 4. However, where the trial court, after reviewing the performance of defense counsel for the entire trial and considering the allegations of the defendant, finds that the question may be resolved as a matter of law, the matter may be concluded without hearing.

With the exception of the defendant's allegation concerning Loudermilk and Copridge, most of the defendant's claims regarding ineffective assistance of counsel are without merit. They amount to bare assertions of the defendant without support in the record. We have previously examined some of the claims regarding ineffective assistance and concluded that claims such as the statute of limitations contention have no merit. Regarding the defendant's claim that his counsel should have called Loudermilk and Copridge, it is clear that any attempt to call Copridge would have been futile as Copridge's own conviction was on appeal and, thus, Copridge could have asserted his Fifth Amendment right not to testify. The defendant did not proffer to the court the content of Loudermilk's testimony other than to indicate that Loudermilk would testify as to how long the defendant was at Williams' apartment on the night of the murder. However, any testimony of this nature would have been suspect, especially considering the defendant's statement to police that he was at Williams' apartment until the purported fight between Copridge and Williams began. Under these circumstances, it would be reasonable for the trial court to assume that failure to call such witnesses was attributed to sound defense strategy. We conclude that there is sufficient evidence in the record for the trial court to have made a deter-

mination without hearing that the defendant failed to establish that counsel's performance was deficient and or that any deficient performance by counsel did not prejudice the defendant. Therefore, we conclude the trial court's denial of his motion alleging ineffective assistance of counsel was proper.

(3) The defendant's right to self-representation

The defendant contends that the trial court prevented him from representing himself. There is no merit to this claim. Contrary to the defendant's assertion, the trial court did not deny him the right to represent himself. While the court did advise against self-representation, the trial court advised the defendant he would be able to do so. The fact that the defendant did not avail himself of this opportunity does not mean that he was prevented by the trial court from representing himself.

## ADDITIONAL TRIAL ISSUES

The defendant raises the following additional issues: (1) the sufficiency of the evidence; (2) the withholding of exculpatory evidence; (3) the trial court's giving of an instruction on aiding and abetting over objection of the defendant; (4) the trial court's failure to remove three jurors for cause; and (5) the defendant's contentions that the clothing and buttons worn by the family of the victim prejudiced the defendant's right to a fair trial.

(1) Sufficiency of evidence

We have previously set forth the facts regarding the crimes in detail. Under the facts, we have no hesitancy in concluding, after review of all the evidence, viewed in a light most favorable to the prosecution, that a rational factfinder could have found the defendant guilty of each offense beyond a reasonable doubt. See *State v. Claiborne*, 262 Kan. 416, Syl. ¶ 5, 940 P.2d 27 (1977).

(2) Exculpatory evidence

The defendant argues that the State withheld exculpatory evidence that prejudiced his right to a fair trial. Specifically, he argued that a travel pass he received from a probation officer, which would indicate that he had a reason other than for the sale of a stolen vehicle to be in Oklahoma, was withheld by the State. The basic

flaw with the defendant's contention is that the defendant had personal knowledge of this fact available to him before and during the trial. Thus, he is not prejudiced by the State's failure to produce such evidence. *State v. Peckham*, 255 Kan. 310, 341, 875 P.2d 257 (1994). Further, Landwehr testified at trial that the defendant did in fact have an appointment in Oklahoma and that he arrived at that appointment. Thus, the jury was informed that the defendant did have a legitimate noncriminal reason for being in Oklahoma, and no prejudice resulted from the failure of the State to inform the defendant of the travel pass.

The defendant also contends that he was not informed by the State that State's witness, Benjamin Amaro, Jr., was sent to Lansing along with Copridge. The defendant contends that he was entitled to know this information. However, he fails to show how the failure to receive this information prejudiced his case. Further, it was clear from the transport orders filed in this case that both Copridge and Amaro were at Lansing. Therefore, the State did not withhold information, and the defendant is not entitled to relief.

(3) Aiding and abetting

The defendant contends there was not sufficient evidence to show that he aided and abetted in the crimes charged and at most, the evidence established that he merely associated with Copridge, the true perpetrator. Contrary to the defendant's contention, the evidence at trial disclosed that the defendant entered into a plan with Copridge to rob the victim and the defendant discussed this plan in the presence of others. The defendant admitted that he went with Copridge to the victim's residence the evening of the robbery and murder. Ample evidence supported the giving of an instruction on aiding and abetting. See *State v. Words*, 226 Kan. 59, 64-65, 596 P.2d 129 (1979).

(4) Challenge for cause

We have reviewed the record concerning the defendant's challenges for cause. Based upon this review, we conclude the defendant's assertions in this regard have no merit. In one instance, defense counsel suggested that the challenged juror be made an alternate. This was done, and the challenged juror did not sit on

the panel that convicted the defendant. In a second instance, the trial court carefully questioned a juror's prior knowledge of the Copridge trial. When it was determined that the challenged juror had no such knowledge, defense counsel decided not to object and the record supports that no subsequent challenge for cause existed. Finally, a juror indicated that she knew a witness who was to testify at trial. When the court determined there was no issue about the fact the witness was going to testify to, the court took no further action. Moreover, the defendant, in his statement to the police, admitted the very fact that the witness testified to at trial. Under the circumstances, there was no basis for a challenge for cause.

(5) Clothing and buttons worn by the family of the victim

The defendant next contends that the buttons and t-shirts worn by certain members of Williams' family prejudiced his right to a fair trial. He argues that his conviction should be overturned due to this prejudice.

During trial, the defendant called the court's attention to the fact that members of Williams' family were wearing buttons in the courtroom with Williams' picture on them. The defendant asked that the family members be directed to remove the buttons, which request was denied by the court. Later, the defendant showed the court that the family members were wearing t-shirts with a picture of Williams on them. The defendant requested that the family members be directed to remove the shirts, which request was also denied. In denying the request, the court noted that the jurors had been directed to decide the case on the evidence presented.

In *State v. Bradford*, 254 Kan. 133, 141-42, 864 P.2d 680 (1993), a similar incident was addressed when spectators wore buttons with the victim's picture. We determined in *Bradford* that the district court did not abuse its discretion in failing to ask the spectators to remove the buttons at the outset of trial. 254 Kan. at 142.

In this case, however, the court refused to direct the spectators to remove the buttons and t-shirts and, thus, the case is more directly similar to *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986). In *McNaught*, spectators at trial wore Mothers Against Drunk Driving and Students Against Drunk Driving buttons which

the court refused to direct the spectators to remove. We held that, in the administration of justice, the trial judge is charged with the preservation of order in his or her court with the duty to see that justice is not obstructed by any person or persons whatsoever. We also noted that a large measure of discretion resides in the trial court in this respect and its exercise of that discretion will not be disturbed on appeal unless it appears that prejudice resulted from the denial of a legal right. 238 Kan. at 577. We then determined that where the record did not show the number of persons wearing buttons, or contain any evidence that the jurors showed concern about the buttons, no prejudice or abuse of discretion resulted. 238 Kan. at 580.

As in *McNaught*, there was no evidence regarding the number of spectators wearing the buttons or t-shirts and also no evidence that the jurors were in any way affected by the buttons or t-shirts. That being said, however, it would seem that the wearing of such buttons or t-shirts is not a good idea because of the possibility of prejudice which might result. Under the circumstances, it would have been better for the district court to have ordered the buttons removed or the t-shirts covered up. However, under the standard we set in *McNaught*, the defendant has failed to show that his rights were prejudiced by the spectators' display.

## COLLATERAL ESTOPPEL

The defendant also contends that the trial court erred in failing to dismiss the charges against him on the basis of collateral estoppel. He contends there had already been an adjudication on the merits in Oklahoma arising out of the same transaction. We find no merit in this contention.

Collateral estoppel means nothing more than double jeopardy when applied in the context of a criminal case. See *State v. Pruitt*, 216 Kan. 103, 105, 531 P.2d 860 (1975). The United States Supreme Court has determined that the Fifth Amendment prohibition against double jeopardy does not apply to prohibit prosecutions by separate sovereignties. See *Heath v. Alabama*, 474 U.S. 82, 87-89, 88 L. Ed. 2d 387, 106 S. Ct. 433 (1985).

K.S.A. 21-3108(3)(a) provides that a prosecution is barred if the defendant was formally prosecuted in a court of general jurisdiction of a sister state for a crime that is within the concurrent jurisdiction of this state, if the former prosecution resulted in a conviction or acquittal and the subsequent prosecution is for the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution, or the offense was not consummated when the former trial began. In order for both states to have concurrent jurisdiction over the same crime, the two different courts must have the jurisdiction over the subject matter of the controversy, with either court being the proper forum for its resolution. *State v. Henwood*, 243 Kan. 326, 330-32, 756 P.2d 1087 (1988).

While Oklahoma had jurisdiction to prosecute the defendant for possession of stolen property, it had no jurisdiction to prosecute the defendant for the murder, kidnapping, or robbery. Thus, the provisions of K.S.A. 21-3108(3)(a) do not bar the prosecution of the defendant in the state of Kansas for the crimes of murder, robbery, and aggravated kidnapping.

## SENTENCING ISSUES

The defendant raises the following issues regarding his sentence: (1) The trial court erred in sentencing him without his presentence investigation (PSI) report and later denying his motion to be present and represent himself at a subsequent hearing, and (2) the trial court erred in sentencing the defendant on the first-degree murder charge rather than the felony-murder charge.

(1) The PSI report

At the time of sentencing, the defendant did not submit his own report, and it was not included in the PSI report. He contended before the trial court that he did not receive the proper forms, at which time the court stated that the defendant could either continue the sentencing to fill out his form, or the defendant could tell the court the information orally. The defendant then spoke to the court at length regarding his denial of the offense. The defendant's contention that the sentence was improper because the court did not consider his version of the events in the PSI report has no merit.

The defendant further argues that he completed his PSI report form, but the court, after a modification hearing in which he was not present, failed to consider it. However, the hearing of which the defendant complains was not a modification hearing but simply a proceeding to determine whether a hearing was necessary because of the recently received information from the defendant's completed form. Both the defendant's attorney and the State informed the court that they had no objection to a further hearing with the defendant present. However, the court determined that no hearing was necessary. The hearing was not on a motion to modify sentence. The defendant had no right to be present, and the district court was not obligated to consider the new information contained in the PSI report, particularly because the defendant at the time of sentencing was able to present all of this information to the district court prior to the imposition of his sentence.

(2) Conviction of first-degree rather than felony murder

The defendant contends that felony murder and premeditated murder are no longer alternate methods but rather that felony murder is a lesser crime and, therefore, he should be sentenced to life with parole eligibility in 15 years under felony murder rather than life with parole eligibility in 25 years under first-degree murder.

The defendant bases this argument on an erroneous conclusion of law. The provisions of K.S.A. 22-3717(b)(1) and (2) provide that a defendant who is sentenced to life in prison for premeditated murder is eligible for parole after 25 years, while a defendant sentenced to life in prison for felony murder is eligible after 15 years. However, these provisions apply to crimes committed after July 1, 1994. K.S.A. 22-3717(b)(1). The defendant's crimes were committed prior to July 1, 1994, and, therefore, his murder sentence is governed by K.S.A. 1993 Supp. 22-3717, which provides for life in prison with parole eligibility in 15 years regardless of whether the crime was premeditated murder or felony murder.

## LESSER INCLUDED OFFENSE INSTRUCTIONS

As his assignment of error, the defendant contends that the trial court erred in refusing to instruct on the lesser included offenses

of second-degree murder, voluntary manslaughter, and involuntary manslaughter, as well as instructions on withdrawal and mere presence or association. He contends that the failure to give such instructions entitles him to a new trial.

With regard to lesser included offenses, we have held:

"The defendant has a right to have the court instruct the jury on all lesser included offenses established by substantial evidence, however weak, unsatisfactory, or inconclusive the evidence may appear to the court. Even the unsupported testimony of the defendant alone, if tending to establish such lesser offense, is sufficient to require the court to so instruct. However, the evidence must be substantial and there must be evidence which, when viewed in a light most favorable to the defendant, would justify a jury finding in accordance with the defendant's theory." *State v. Harmon,* 254 Kan. 87, Syl. ¶ 1, 865 P.2d 1011 (1993).

With regard to the defendant's first-degree murder conviction, while there is evidence from which a reasonable person could conclude that Copridge killed Williams with premeditation, the evidence might be insufficient to establish the liability of the defendant in the first-degree murder. Further, it is questionable as to whether Copridge actually did kill Williams in a premeditated manner. Although there was evidence that Williams' wrists had tape on them, indicating that Williams was at some point bound, there is no evidence to indicate whether Williams was bound when he was killed, or whether he somehow escaped confinement and tried to stop Copridge or the defendant, with the result that he was killed. This court has held that in a prosecution for premeditated first-degree murder, where there is no direct evidence as to the circumstances of the killing, and the evidence introduced against the defendant is wholly circumstantial and open to the inference by the jury that the offense committed may have been second-degree murder, it is the duty of the court to instruct the jury respecting that degree of homicide. *State v. Sanders,* 258 Kan. 409, 416, 904 P.2d 951 (1995).

In this case, where there is no direct evidence regarding the nature of the killing, instructions on lesser included offenses to first-degree murder were arguably required. However, the failure to give such instructions does not require a reversal of this case because the defendant was also convicted by the jury of the alter-

nate charge of felony murder. The rule in Kansas with regard to felony murder is that the jury need not be instructed on lesser offenses unless evidence of the underlying felony is weak and inconclusive. *State v. Altum*, 262 Kan. 733, 738-39, 941 P.2d 1348 (1997). In this case, the evidence of the underlying felonies was neither weak nor inconclusive, and no lesser included offense instructions were necessary with regard to felony murder.

The defendant also contends that the court should have, *sua sponte*, given instructions on withdrawal as a defense to aiding and abetting felony murder, aggravated kidnapping, and aggravated robbery. He argues that the evidence showed that he had withdrawn from the enterprise, leaving before any crimes were committed.

However, this court has held that while withdrawal is a defense to a charge of conspiracy, it is not a defense to a charge of aiding and abetting. See *State v. Kaiser*, 260 Kan. 235, 247-49, 918 P.2d 629 (1996). As a result, the district court did not err in failing to instruct on withdrawal as a defense to aiding and abetting.

The defendant further contends that the district court should have instructed the jury that mere association with the principals who commit the crime or mere presence in the vicinity of the crime is insufficient to support guilt as an aider and abettor. However, in *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987), we held that the jury need not be instructed on mere association, because the pattern jury instruction clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction. Therefore, an instruction on mere association or presence was not necessary, and the district court did not err in giving such an instruction *sua sponte*.

Affirmed.